ALCOA STEAMSHIP COMPANY, Inc., Appellant,

v.

CHARLES FERRAN & COMPANY, Inc., et al., Appellees.

CHARLES FERRAN & COMPANY, Inc., et al., Appellants,

v.

ALCOA STEAMSHIP COMPANY, Inc., Appellee.

No. 23555.

United States Court of Appeals Fifth Circuit.

Sept. 12, 1967.

Benjamin W. Yancey, Edward S. Bagley, Francis Emmett, New Orleans, La., for appellants.

George B. Matthews, Leon Sarpy, New Orleans, La., for appellees.

Before BROWN, Chief Judge, MOORE* and BELL, Circuit Judges.

MOORE, Circuit Judge:

Alcoa Steamship Company, Inc. (Alcoa) brought a libel in the United States District Court for the Eastern District of Louisiana before Hon. Frank B. Ellis, against Charles Ferran & Co., Inc. (Ferran), a ship repair contractor and Ferran's liability underwriters (providing coverage up to $1,000,000) to recover damages caused to Alcoa's ship, the SS *Alcoa Corsair*, by a fire allegedly caused by the negligence of Ferran in executing certain repairs to the *Corsair's* boiler. The district court found Ferran liable for the damages, but further found that the contract to repair was governed by a "Red Letter" clause limiting Ferran's liability to $300,000. In addition, the district court determined that the doctrine of avoidable consequences was applicable and left it to a Special Master, appointed to resolve the issue of damages, to assess the portion of damages (not recoverable by Alcoa) attributable to Alcoa's negligence in failing speedily to arrest the spreading of the fire. Ferran has appealed from the district court's finding of negligence chargeable to Ferran and from that court's failure to conclude that the unseaworthiness of the vessel at the time of the accident should mitigate, if not foreclose, Ferran's accountability for damages. Alcoa has appealed from the findings that (1) the "Red Letter" clause was a part of the repair contract, (2) the clause was not invalid as against public policy, and (3) the clause, if valid, was available as a defense to the underwriters. In addition, Alcoa urges that Ferran did not sustain its burden of proof below in establishing any acts of Alcoa's negligence that would bring the doctrine of avoidable consequences into play.

The District Court's findings:

The facts as found by the district court are substantially as follows:[1] the *Corsair* arrived in New Orleans from Mobile, Alabama, on October 4, 1956, at which time Alcoa's local port captain notified Ferran of certain general repairs which the ship needed (as will be discussed later, Ferran had traditionally done most of the *Corsair's* repair work since the vessel's commission in 1947). One of the repairs requested was the rebricking of the floor of the fire box of the starboard boiler. No work was done on the boiler on that day, but Ferran assisted the United States Coast Guard and the American Bureau of Shipping on their inspection of the *Corsair*, both agencies concluding at the end of their inspection the following day that the ship's gear, equipment and fittings, including its fire-fighting system, were in good order.

On the morning of October 5th, Ferran's labor gang boarded the *Corsair* to begin the work on the fire box. Some description of the boiler in question is necessary in order to understand the sequence of events that followed. The two identical boilers on the ship operate on a combustion principle, burning a mixture of air and oil, the oil being pre-heated to about 230 degrees F. by circulation through a heating system. The oil descends from a manifold pipe located along the top of the boiler through four "droplines"—coupled to valves at both top and bottom of each—into four burners spaced along the side of the boiler, where it is atomized, mixed with air (driven in by a forced air blower) and

---

* Of the Second Circuit, sitting by designation.

1. The district court wrote two opinions reported in 242 F.Supp. 962 (E.D.La. 1965) and in 251 F.Supp. 823 (E.D.La. 1966); the findings with respect to the historical facts reported in the first opinion were not altered in the second opinion which was directed chiefly at legal points raised by the parties during re-argument.

sprayed into the firebox. The burner positions along the boiler are commonly known as registers. To gain access to the firebox, any one register may be removed upon disconnecting its dropline at both ends and undoing a series of bolts, thus creating an opening wide enough to pass materials through. The registers are numbered arbitrarily one through four from forward to aft with numbers two and three being lower on the boiler than the other two. On each boiler there is also an access door which is large enough to allow a man to enter the firebox.

The District Court found that to rebrick the firebox, Ferran employees opened the access door and removed register #3, thus by necessity removing the #3 dropline by uncoupling it at its top and bottom. At 9:30 in the evening of the 5th, the brickwork was finished and the Ferran workers replaced the register. At the point where the #3 dropline was to be reconnected at its upper end, there was a male fitting whose threads were worn and which should have been replaced by Ferran. A Ferran employee nevertheless tightened the defective fitting. The job completed, the Ferran employees cleaned up the area, took their tools and left the ship, leaving instructions written on a blackboard for the night fireman to fire the burners for short periods of time to dry the brickwork.

Alcoa's fireman Gomez came on duty at 2:00 A.M. and fired two of the burners, including the burner on the #3 register, for 10 to 15 minutes, experiencing no difficulty. At 4:00 A.M., fireman Deale relieved Gomez, all of the burners at that point being off. At about 4:20 A.M., Deale made preparations to continue the rotation of the burners. Desiring to fire burner #3, he circulated the oil to raise it to the proper temperature and probably turned on the forced draft blower (apparently necessary to clear the firebox of any fumes prior to the insertion of a lighted torch). He then lit a torch, turned on the fuel valve at the top of dropline #3, inserted the

torch into the burner barrel, and began to open the valve at the bottom of dropline #3. At this point, hot oil hit him in the face and arm "from up above" (Deale's words), causing him to jump back, thereby withdrawing the torch from the burner, the torch igniting the oil now gushing from the parted defective fitting to which the #3 dropline had been connected.

The intense heat of the fire prevented Deale from reaching the fuel shut-off valve located, unfortunately, at the forward end of the boiler and thus totally inaccessible once the fire had begun. Rushing to the after end of the engine room, hoping to go through the $CO_2$ room to reach the remote controls for the fuel oil system, Deale found the door to the $CO_2$ room locked. Although Deale nevertheless managed to escape from the engine room, he was unable to do anything to control the fire. Night Relief Engineer Moses, overcome by smoke and heat, was the sole casualty of the fire, dying of asphyxiation on the generator flat one level above the fire room.

The fire raged on for some forty minutes before the *Corsair's* Chief Engineer, not on board at the time the fire started, arrived on the scene and successfully cut off the supply of boiler fuel feeding the fire. There was evidence that the skeleton crew of 20 on board at the time of the fire were unable to cut off the fuel supply due to their ignorance as to the location of the controls. The district court also found that two doors leading out of the engine spaces, clearly marked "KEEP THESE DOORS CLOSED AT ALL TIMES", were wide open at the time of the fire, thus aggravating the extent of the damages caused by the fire. The *Corsair* was badly damaged.

The applicable law:

■ Alcoa seeks to recover $1,000,000 in damages, either in contract on the theory that Ferran breached its warranty of workmanlike service, see Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 133–134, 76 S. Ct. 232, 100 L.Ed. 133 (1956), or in tort on the theory that Ferran was negligent

in repairing the boiler. The question immediately arises as to what law governs the various facets of Ferran's repair contract with Alcoa. This involves a two-step procedure: (1) Was the contract maritime and, thus, subject to maritime law? (2) If so, is the particular issue to be resolved of such a local nature that state law should be applied? See Kossick v. United Fruit Co., 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961); Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955). For even though admiralty suits are governed by federal substantive and procedural law, courts applying maritime law may adopt state law by express or implied reference or by virtue of the interstitial nature of federal law. See Wilburn, supra; SS Philippine Jose Abad Santos v. Bannister, 335 F.2d 595 (5th Cir. 1964).

It is well settled that a contract to repair a vessel is maritime. North Pacific Steamship Co. v. Hall Brothers Marine Railway & Shipbuilding Co., 249 U.S. 119, 39 S.Ct. 221, 63 L. Ed. 510 (1919); 1 Benedict on Admiralty, § 66 n. 32 (6th ed., 1966 Supp. by C. R. Knauth). Consequently, a shipowner has a maritime cause of action whether he sues in contract for a breach of warranty of workmanlike service or in tort for the negligent performance of a maritime contract. See Southport Transit Co. v. Avondale Marine Ways, Inc., 234 F.2d 947, 955 (5th Cir. 1956). Federal law governs the construction of the terms of the repair contract, see Booth Steamship Co. v. Meier & Oelhof Co., 262 F.2d 310 (2d Cir. 1958), and would also appear to govern the standard of performance due under the contract. See *Southport Transit Co.*, supra. Thus the applicability of state law in repair cases is sharply limited to issues not touched by maritime law where state statutes fill in the gap in a manner not destructive of the uniformity admiralty seeks. See The Tungus v. Skovgaard, 358 U.S. 588, 594, 79 S.Ct. 503, 3 L.Ed. 2d 524 (1959); see generally Comment, Admiralty Jurisdiction: Airplanes and

Wrongful Death in Territorial Waters, 64 Colum.L.Rev. 1084, 1092–96 (1964). In the context of the instant case, federal law governs every issue with the exception of the applicability and effect of the Louisiana direct action statute discussed infra.

Ferran's negligence:

Ferran attacks the district court's findings that (1) Ferran's employees removed register #3 at all (thus Ferran maintains that the upper coupling on the #3 dropline was never undone), and (2) the coupling was defective prior to the fire (it being established at the trial that the coupling was in a damaged condition after the fire). Ferran further contends that the break in the coupling was caused by an explosion set off when Deale negligently put the lighted torch into the burner without having turned on the forced draft blower to clear the fumes out of the fire box.

Ferran recognizes that in reviewing the judgment of a district court sitting without a jury in admiralty, an appellate court exercises no greater scope of review than it exercises under F.R. Civ.Proc. 52(a) and, thus, may not set aside a district court finding unless "clearly erroneous." McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L. Ed. 20 (1954). Ferran argues, however, that the "clearly erroneous" test does not apply to a district court's findings on negligence as an appellate court is just as able to determine whether a given fact situation constitutes negligence as the district court. See Mamiye Bros. v. Barber Steamship Lines, Inc., 360 F.2d 774 (2d Cir. 1966). Correct as this statement may be, a glance at Ferran's allegations of error discloses that it is attacking not the district court's conclusions on negligence but that court's findings with regard to the underlying, historical facts. Thus, we may not set aside the above lower court's findings unless we find them to be "clearly erroneous."

With respect to whether Ferran did or did not remove register #3, thus necessitating the removal of the #3 dropline, the evidence was highly conflicting. A

brief review of the testimony of several witnesses illustrates the difficulty the District Court faced in attempting to reconstruct the course of events at a trial held six and one-half years after the fire.

None of Ferran's witnesses testified directly that the #3 register had been removed. Hubert H. Hambrice, Ferran's then labor superintendent who was on duty from 8:00 A.M. to 5:00 P.M. on October 5th in charge of the labor crew working on the Corsair's starboard boiler, identified on a photograph of the boiler the #2 register (lower front) as the one that had been removed to facilitate the repairs. He further indicated that the access door had been opened, but that no other registers had been removed. Hambrice could not recall, however, whether the register had been removed before or after he came aboard, whether it had been replaced before he left or any other details about the job. In fact, the only thing he could remember clearly was that the #2 register had been removed.

Willie Harris, a Ferran day shift laborer who had worked on the boiler, testified that the lower front register (#2) was the only register removed. In an earlier deposition, however, Harris had been unable to recall which register had been removed. At the trial, he explained this discrepancy by remarking, "it came to me [after the deposition] just how this thing could be done."

Louis G. Tavan, Ferran's superintendent of repairs, testified that the #2 register was off, but conceded on cross-examination that there may have been two registers off; he could not recall the conditions of the various droplines.

Daniel Reed, a labor pusher for Ferran whose job it was to get men to clean up the trash in the boiler room, stated that "the lower register next to the access door" (#2) was the only one that was removed. In an earlier deposition, however, he had identified the #3 register as the one removed, by pointing to it on a photograph that distinctly showed the positions of the various registers in relation to the access door. His explanation at trial that he had been confused as to the numbering of the registers at the previous identification did not explain his earlier unequivocal designation on the photograph of the lower aft register away from the access door.

Two other Ferran employees present during the repair job, James Hill and Fee Carr, could not remember which register had been removed.

Alcoa's witnesses had a different story to tell. Roy T. Lemon, who had been Chief Engineer on the Corsair in October, 1956, was quite sure that both lower registers (#'s 2 and 3) and the access door had been removed. Similarly, Floyd L. Johnson who had been Third Assistant Engineer testified that both lower registers were out. Night relief engineer, Donald Kent, who came on board at 5:00 P.M. on October 5th stated at the trial that, although he could not remember clearly, his best recollection was that the lower aft register (#3) was out. He was unable, however, to explain why he had told the Coast Guard at an enquiry held shortly after the fire that the #2 register was the one that was removed. Alcoa's version of which register was off was further weakened by the adverse inference that arose when it failed to produce its day fireman, who was readily available, and who had been on duty in the boiler room tending the port boiler from 8:00 A.M. to 4:00 P.M. on the day the repairs were carried out by Ferran.

Somewhere in between these two versions is the testimony of Peter J. Marchetta, Ferran's night labor foreman who came on board the Corsair shortly after 5:00 P.M. He testified that the boiler rebricking was almost completed when he arrived and that the registers were "all in". Marchetta recalled that he set about to hook up the various droplines; that he had hooked up the bottom and the top of dropline #1, but had only fastened the bottom fittings of droplines 2, 3 and 4 which were already attached at their tops. He did check the tops of those droplines, however, and finding the top of #3 loose, he had tightened it

with his wrench two half-turns, thus allowing the inference that some one else had done it up hand tight shortly before. He further remembered that the upper fitting on the #3 dropline had been painted with aluminum paint.

The district court found as a fact that the #3 register and the #3 dropline had been removed and replaced by Ferran employees, apparently believing Alcoa's witnesses while disbelieving most of Ferran's. This conclusion was based to a large extent on Marchetta's testimony, the one Ferran witness the court found credible, that he had tightened the upper fitting on the #3 dropline, as the court stated:

> "* * * one or more of the Ferran employees re-engaged the female fitting of the #3 dropline with [the] improper male fitting.
>
> "The identity of the Ferran employee or employees who made this reconnection is not absolutely clear, as there may have been someone other than Marchetta who had put the fittings together hand tight before Marchetta used a wrench to tighten the coupling.
>
> "The Court finds as a matter of fact that what is absolutely clear is that Ferran employees did reconnect the upper coupling of the #3 dropline with a worn and consequently improper fitting. * * *" 242 F.Supp. at 968

In view of the conflicting testimony on this issue, the trial judge had to resolve this dispute largely upon his judgment of the credibility of the witnesses. His finding that Ferran had disconnected and reconnected the #3 dropline is certainly not clearly erroneous.

The same conclusion must be reached, we believe, with respect to the district court's finding that the male fitting to which the upper end of dropline #3 was connected was defective when the Ferran employee reconnected the coupling, and should have been replaced (that Ferran had a duty to replace defective parts was admitted by its superintendent Tavan). Once again, however, the evidence is sus-

ceptible of differing interpretations. For example, Alcoa's fireman Gomez had fired the burner at the #3 register for 10 to 15 minutes to dry the brickwork after the repairs had been completed but before the fire. During this time, dropline #3 was subjected to the usual oil pressures incurred in feeding the burner, but did not part. Relying on the testimony of its expert metallurgist, Dr. M. M. Gilkeson, that a fitting is either good or bad and either holds pressure or does not, Ferran argues that if the fitting held pressure during Gomez' operation of the boiler, it must have been in good condition. Ferran contends that the damage to the fitting—the fitting itself was introduced into evidence at the trial and shown to be in a badly stripped condition —must have been incurred during the fire, probably as a result of a flareback caused by Deale's negligence in attempting to light the #3 burner. See discussion, infra. On the other hand, Ferran's own machinist superintendent, Benjamin G. Morrison, testified on cross-examination that the damaged condition of the fitting was probably due to constant wear and strain and not from fire. Similarly, Dr. Gilkeson conceded on cross-examination that it is conceivable that a long series of removals and replacements might have stripped the fitting and further conceded that the fitting could have been defective during Gomez' firing and yet held together only to part finally when Deale went to light the burner. Concerning Ferran's explosion or flareback theory, the expert commented that although he had examined the fitting with the explosion theory in mind, he could detect no evidence that the damage to the fitting was caused by a sudden explosion.

Ferran also contends that there was a failure of proof that the condition of the fitting at the trial was the same as immediately after the fire and was neither caused by, nor aggravated by, severe tests performed on it prior to trial. This point is without merit as (1) Morrison testified that the damaged condition of the fitting had been brought to his atten-

tion shortly after the fire, (2) Lieutenant Commander Walton D. Alley, Jr., the Coast Guard's Investigating Officer, testified that he had gone aboard the *Corsair* the day after the fire, had examined the fitting then and there and had found the threads "definitely upset", and (3) Dr. Gilkeson, an observer at the various tests performed on the fitting, related in detail the steps taken to test the condition of the fitting, his testimony allowing only the conclusion that the fitting was badly damaged prior to the tests.

■ The foregoing discussion demonstrates, we believe, that the district court's finding with respect to the condition of the fitting prior to the fire is amply supported by the record.

Finally, Ferran contends that the district court erred in rejecting its explosion theory. Although its expert Dr. Gilkeson could report no evidence of an explosion from the fitting itself, he did not foreclose the possibility that an explosion caused the fitting to part. Ferran's hypothesis is that the fire was caused, at least in part, by Deale's negligence lighting of the burner without having turned on the forced draft blower, apparently necessary to clear the boiler of excessive fumes prior to the insertion of a lighted torch. In support of its position, Ferran points to the testimony of Machinist Superintendent Morrison that he found the valve for the forced draft blower in an off position immediately after the fire and the fact that the steel burner head Deale had inserted in the #3 register was found smashed into several fragments.

Once again, however, there is evidence on the record to contradict Ferran's position. Ferran's General Manager, Albert M. Kreihs, had gone into the engine room on the day of the fire and testified at the trial on cross-examination that to the best of his knowledge from examining the boiler after the fire there was no explosion, and Commander Alley recalled that there was "no evidence of an explosion of any magnitude whatsoever," although he did indicate that flarebacks normally leave no evidence within a boiler. Commander Alley also expressed his opinion that the burner throat was probably fractured either on account of the intense heat of the fire or by striking something, but would not have been fractured by internal pressure inside the boiler.

The testimony of Ferran's expert Jawn W. Marques, who held a Chief Engineer license and had worked on vessels with power plants similar to the *Corsair's*, that, on the basis of a hypothetical question posed to him, the casualty was caused by a flareback is not too helpful as this opinion was based on the assumption that Deale had not turned on the forced draft blower, a question of fact in controversy. Deale himself testified that he had turned the blower on and Alcoa's Chief Engineer Lemon testified in direct opposition to Ferran's Morrison that in his inspection immediately after the fire he had found the valve of the forced draft blower "opened slightly" in a normal operating position.

■ The district court found Deale's testimony to be clear and credible and further found that the physical facts did not support the explosion theory. The record clearly supports these findings thus reinforcing the conclusion that the sole proximate cause of the fire was the defective fitting on the #3 dropline.

Avoidable consequences:

In its first opinion, the district court found that the *Corsair* was unseaworthy due to the inaccessibility of the shut-off valve on the boiler and the locked $CO_2$ room and, also, indicated that the crew had been negligent in not knowing where the control valves were located on the ship. The court concluded "that these acts of negligence and unseaworthiness warrant the application of the doctrine of 'avoidable consequences'." In its second opinion, after reargument, the court qualified this statement by agreeing with Alcoa that the doctrine of avoidable consequences "does not apply to conditions or conduct attributable to Alcoa which preceded Ferran's negligence." The

court then reserved the question of whether there was a sufficient failure on Alcoa's part to mitigate damages after the fire had begun to bring the doctrine into play, stating that such a question was an issue of damages to be decided by the Special Master.

The court relied on Southport Transit Co. v. Avondale Marine Ways, Inc., 234 F.2d 947 (5th Cir.1956), for the proposition that "avoidable consequences" applies only after a defendant's negligence is complete. In the instant case, Ferran's negligence was complete when its employees left the ship. The fire itself was started solely on account of Ferran's negligence, so there is no question of contributory negligence barring or reducing recovery. The district court further relied on the principle that a tortfeasor takes his victim as he finds him.

▮▮▮▮ The district court was correct in its second opinion in limiting the application of the doctrine to acts attributable to Alcoa after the fire. The general rule has been stated as follows:

"After the original impact or injury (to which plaintiff's negligence did not contribute), plaintiff's negligence may intervene to aggravate its consequences. Thus he may neglect to carelessly treat a wound, so that it gets infected and he loses his limb or his life. Or he may fail to take reasonable steps to protect property damaged or exposed by defendant's negligence. In cases like these plaintiff may not recover for that aggravation to his injury toward which his negligence contributes. This notion is sometimes referred to as the 'duty' to mitigate damages or the rule of avoidable consequences." 2 Harper & James, The Law of Torts § 22.10, at pp. 1231–32 (1956) (footnotes omitted).

Here, the condition of the ship at the time of the fire, whether unseaworthy or seaworthy, is irrelevant to the question of damages as the sole cause of the fire was Ferran's negligence. Thus, for example, the fact that someone had locked the door to the $CO_2$ room and had thus prevented Deale from reaching vital controls does not of itself reduce the damages recoverable by Alcoa as the door was locked before the fire and in no way was a cause of the fire. Any negligence attributable to Alcoa after the fire, however, such as a failure of crew members to act, consistent with their then existing state of knowledge and skill, with due despatch in arresting the conflagration, can be considered in mitigation of damages.

▮▮▮ Alcoa, in its appeal, argues that Ferran failed to sustain its burden below of establishing any negligence on Alcoa's part after the fire began as the District Court stated that "facts relating to possible reduction of any damage award due to Alcoa's failure to mitigate such damages were not presented with sufficient particularity to support a finding, one way or the other." Thus, Alcoa argues, Ferran should be foreclosed from relitigating the issue. The District Court, however, expressly found that the propriety of Alcoa's conduct after the fire began was an issue of damages to be tried before the Special Master. Thus the court's above-quoted statement cannot be read to foreclose Ferran from submitting further evidence on this point at any future proceedings held before a Special Master.

Applicability and validity of the "Red Letter" clause:

As mentioned earlier, Ferran had performed repairs on the *Corsair* many times prior to the time of the fire, and had an informal understanding with Alcoa to handle all the repairs to the *Corsair* when she was in New Orleans. The usual repair contract was made and performed in roughly the following manner: Upon the *Corsair's* arrival into port, Alcoa would notify Ferran of the repairs needed. Ferran's superintendent would go on board, survey the work to be done, and submit a written estimate to alcoa. If Alcoa approved, it would send Ferran an order on Alcoa's form and the work would be done. Upon completion of the work, Ferran would send Alcoa an invoice, usually after the *Corsair* had sailed. The invoice was the only document

to contain the so-called "Red Letter" clause which read in part:

"We contract only upon the following terms, applicable to every contract, * * *

"Furthermore, we undertake to perform work on vessels * * * only upon the condition that we shall not be liable in respect to any one vessel, directly or indirectly in contract, tort or otherwise, to its owners * * * for any injury to such vessel * * * unless such injury is caused by our negligence * * * and in no event shall our aggregate liability * * * exceed the sum of $300,000.00."

Alcoa admits receiving an invoice for the October 5th repairs to the starboard boiler containing the above clause. Alcoa also admitted that it was aware of the existence of the clause on the various invoices and had read it. The company also knew that such a clause was standard in repair contracts with other domestic shipyards.

■■■ Ferran maintains, and the District Court so concluded, that the "Red Letter" clause was implied in every repair contract from the fact that Alcoa knew of the clause and acquiesced in its continued presence on the invoices. Alcoa argues strenuously that as the clause was never put on any document until after a repair contract was completed, it never became a part of any repair contract. While this issue may be a good deal closer than the District Court indicated, the practice in the industry and the previous Alcoa-Ferran relations were sufficient to put Alcoa on full notice that the clause was implied in every repair contract. See 3 Corbin on Contracts, § 556 (1960 ed.).

■■■ Alcoa's second line of assault, challenges the clause as invalid as against public policy, relying on Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955), where the Supreme Court knocked down a clause purporting to release a tug owner from all liability for negligence in connection with a towage contract. The Court cited two reasons for the decision: (1) to discourage negligence by making wrongdoers pay damages, and (2) to protect those in an inferior bargaining position. 349 U.S. at 91, 75 S.Ct. 629. Neither reason is applicable to the instant case as (1) potential liability for $300,000 should deter negligence, and (2) Alcoa's bargaining position is not that inferior as evidenced by the fact that in a repair contract with Ferran subsequent to the fire, the "Red Letter" clause was specifically excluded. No overwhelming public policy requires us to declare a $300,-000.00 limitation invalid.

Availability of limitation to Ferran's underwriters:

In addition to suing Ferran, Alcoa sued Ferran's underwriters pursuant to the Louisiana Direct Action Statute, LSA–Rev.Stat. 22:655. The applicability of this Louisiana statute in a federal admiralty action against a shipowner's insurer has, for a long time, been the subject of controversy, see Maryland Casualty Co. v. Cushing, 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954) (court split 4–4–1 on whether the statute was invalid as conflicting with the 1851 federal limitation of shipowner's liability act). The case of in Matter of Independent Towing Co., 242 F.Supp. 950 (E.D.La.1965), represents the most recent attempt to resolve the federal-state conflict, allowing an injured party to recover to the full extent of policy coverage from a shipowner's insurer, but at the same time preserving for the shipowner insurance proceeds to cover his limited liability. See also Guillot et al. v. Cenac Towing Company, Inc., 366 F.2d 898 (5 Cir. 1966).

The instant case does not present that particular state-federal conflict, as the applicability of a state direct action statute against a ship repairer's insurer is not inconsistent with any overriding federal admiralty policy. The remaining question is whether Ferran's $300,000 limitation is available to its underwriters.

**56**

Given the applicability of the Louisiana statute to give Alcoa a direct cause of action against Ferran's underwriters, the question arises whether state law or general maritime law should be applied to determine what defenses are available to the underwriters. This choice of law problem does not involve an *Erie* [2] or *Klaxon* [3] issue as a federal court resolving an admiralty question does not sit, in effect, as only another state court. See Kenney v. Trinidad Corp., 349 F.2d 832, 834–835, (5th Cir. 1965), cert. denied, 382 U.S. 1030, 86 S. Ct. 652, 15 L.Ed.2d 542 (1966). Instead, the question to be answered is, when a federal court adopts a state cause of action in an admiralty case, how much non-procedural state law rides along with it? See The Tungus v. Skovgaard, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959); *Kenney*, supra. However, in this case, application of state or federal law yields the same result; therefore, we need not resolve the choice of law problem, although we note that the general policy of leaving the regulation of matters touching upon insurance to the states would tend to support the District Court's application of state law below.

The District Court applied Art. 2098 of the Louisiana Civil Code and concluded that Ferran's contractual limitation of liability was not a "personal" defense unavailable to its underwriters, pointing out that within the meaning of Art. 2098, "personal" defenses were limited to the type of defense—such as lunacy, bankruptcy, minority, governmental immunity, etc.—granted by law to' all members of a particular class as a matter of public policy. A limitation of liability agreed to by parties in relatively equal bargaining positions does not fall into that category. As the district court stated, "Insurers are not entitled to benefit from a defense based on the insurer's publicly protected legal status, but should benefit from the contractual defenses of

their insured." An analysis of this issue under general maritime law yields the same result.

Judgment affirmed.

2. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

3. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).