790 F.2d 412
 1987 A.M.C. 1361
 FROTA OCEANICA BRASILEIRA, S.A., Plaintiff,
v.
M/V ALICE ST. PHILIP, et al., Defendants.
ST. PHILIP OFFSHORE TOWING CO., INC., et al.,
Defendants-Third Party Plaintiffs-Appellees,
v.
GULF-TAMPA DRYDOCK COMPANY, Third Party Defendant, Appellant.
 No. 85-3263.
 United States Court of Appeals,
Fifth Circuit.
 May 23, 1986.
 
 Steven L. Brannock, Holland & Knight, Brooks P. Hoyt, David W. McCreadie, Tampa, Fla., for third party defendant, appellant.
 James M. Tompkins, New Orleans, La., for defendants-third party plaintiffs-appellees.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before BROWN, JOHNSON, and JOLLY, Circuit Judges.
 JOHN R. BROWN, Circuit Judge:
 
 
 1
 In this appeal we are asked to determine whether the District Court was clearly erroneous when it decided that a steering failure experienced by the tug ALICE ST. PHILIP was caused by the separation of defective steering components supplied by Gulf-Tampa Drydock Company (Gulf-Tampa). We also must decide whether a "red letter" clause in Gulf-Tampa's contract with the tug's operators and owners (St. Philip)[1] limits Gulf-Tampa's liability to St. Philip when the injury resulting from the steering failure was suffered by a non-contracting third party. The District Court held that the red letter clause did not limit Gulf-Tampa's liability to St. Philip.
 
 
 2
 Upon careful examination of the record, we conclude that the District Court was not clearly erroneous in finding that the separation of the steering components was the cause of the steering failure. We also hold that the District Court did not err in refusing to limit Gulf-Tampa's liability under the terms of the red letter clause. We therefore affirm.
 
 ALICE in Blunderland
 
 3
 On January 20, 1980, the tug ALICE ST. PHILIP was towing the barge FAUSTINA upbound in the Mississippi River. The tug had just straightened up after navigating around a left-hand bend in the river. Suddenly, the Captain of the tug, Captain Ellison, felt a hard jerk and noticed that the flotilla was swinging to starboard. The rudder indicator showed that the rudders were hard over. Captain Ellison immediately reported this steering failure via radio transmission and took corrective measures, but the tug was without steering for about seventeen seconds. The M/V FROTALESTE, which was attempting to overtake the tug and tow on the starboard side, had to alter its course to starboard to avoid a collision. The FROTALESTE avoided the flotilla but was unable to correct its course and consequently collided with the M/V CUNENE, which was anchored along the east side of the river. Both the FROTALESTE and the CUNENE sustained severe damage.
 
 
 4
 The tug's engineer, Mike First, immediately investigated the steering system and discovered that the starboard ramrod had separated from the rod eye. This is a critical connection as it attaches the starboard hydraulic cylinder assembly to the starboard tiller arm, thereby providing the essential connection between the hydraulic system and the rudders. Repairs were effected the next day, the steering system was tested, and it worked properly.
 
 Litigation Sets In
 
 5
 The owners of the CUNENE and the FROTALESTE sued St. Philip for the damage to their vessels. St. Philip filed a third party complaint against Gulf-Tampa, alleging that the steering failure was caused by Gulf-Tampa's negligence in improperly repairing the tug's steering system three months prior to the accident.[2] Gulf-Tampa was tendered to the owners of the CUNENE and the FROTALESTE as an original defendant under F.R.Civ.P. 14(c).
 
 
 6
 St. Philip negotiated a settlement agreement with the owners of the CUNENE and the FROTALESTE and paid a total of $1,189,660.25 for the damage to the two vessels. However, by motion and order, St. Philip expressly reserved their rights to recover from Gulf-Tampa and the trial proceeded.
 
 
 7
 At the conclusion of the trial, the District Court ruled in favor of St. Philip on the issue of liability, finding by a preponderance of evidence that Gulf-Tampa was negligent in connection with the repairs performed on the tug's steering system. The Court also found that St. Philip, by a preponderance of the evidence, had proved that the separation of the ramrod from the rod eye was the cause of the hard starboard turn on the day of the accident. Thus, St. Philip was awarded payment from Gulf-Tampa in the amount of $1,189,660.25, the total amount of St. Philip had paid in settlement[3] to the owners of the CUNENE and the FROTALESTE, plus interest. It is Gulf-Tampa's attack on the District Court's finding on causation which serves as the basis for this appeal.[4]
 
 A Tale of Two Theories
 
 8
 At trial, St. Philip and Gulf-Tampa each propounded a different theory regarding the cause of the steering failure. According to St. Philip, the cause of the involuntary hard starboard turn was the separation of the starboard ramrod from its rod eye thereby severing the hydraulic system from the starboard rudder. St. Philip's theory is supported by the discovery of the separated ramrod and rod eye immediately following the casualty. Moreover, testimony was given by witnesses of both parties that the rudders would tend to be forced either port or starboard if a ramrod separated from a rod eye while the tug's steering was at amidships--that is, straight a way.
 
 
 9
 Gulf-Tampa presented an alternative theory of why the steering failed and the rudders drifted hard to starboard. According to Gulf-Tampa's expert witnesses, contaminated hydraulic fluid caused a spool valve to stick, allowing an uncontrolled amount of hydraulic fluid to flow into the hydraulic cylinder. As a result, the rudders were forced hard over to starboard and slammed against the mechanical stop. The separation of the ramrod from the rod eye, according to Gulf-Tampa, was the result rather than the cause of the steering casualty. St. Philip argues, and the District Court recognized, that this theory is undercut by testimony showing that during the post-accident investigation, there was no indication that a spool valve was sticking and no one reported a sticking spool valve to be a problem. Moreover, the steering system worked properly upon the replacement of the starboard hydraulic cylinder assembly without replacement of either spool valves or hydraulic fluid.
 
 
 10
 The District Court, accepting St. Philip's theory, found that the separation of the starboard ramrod from the rod eye was the cause of the tug's steering failure and therefore held Gulf-Tampa liable for the resulting collision between the CUNENE and the FROTALESTE. Because causation is a finding of fact, we must affirm unless we determine that it is clearly erroneous. If the District Court's account of the evidence is plausible in light of the record viewed in its entirety, we may not reverse even if we would have weighed the evidence differently and arrived at a contrary conclusion. See Anderson v. Bessemer City, 470 U.S. ----, ----, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518, 528 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. We have examined the record carefully and, viewing it in its entirety, we cannot conclude that the District Court's view of the evidence was clearly erroneous despite the criticisms of Gulf-Tampa which we later discuss. The District Court was presented with two plausible theories and, upon careful examination of the evidence, chose St. Philip's theory over Gulf-Tampa's.
 
 
 11
 Gulf-Tampa, however, maintains that the District Court's finding was clearly erroneous because the Court's view of the evidence was implausible. First, Gulf-Tampa claims that St. Philip's theory cannot explain why the ramrod separated from the rod eye when the rudder was at amidships rather than during a turn when the forces acting on the ramrod/rod eye connection were much greater. Although the District Court's opinion does not attempt to explain this matter, that hardly makes St. Philip's theory implausible. Numerous exhibits show that the rod eye was so severely worn and corroded that the threads were almost bare. Yet, there was no evidence that the threads had been stripped by a sudden jolt or impact. This is consistent with the ramrod slowly working its way loose from the eye until it came free. Although it may be more likely that the separation of worn parts would occur during a turn rather than when the rudders were at amidships and forces were minimal, this observation in no way makes an amidships separation implausible, especially given the poor condition of the rod eye in this case.
 
 
 12
 Gulf-Tampa's second "implausible" argument is that the theory accepted by the District Court cannot explain why the rudders slammed into the mechanical stop. According to Gulf-Tampa, the evidence shows that if the ramrod had separated from the rod eye, the ram would have "bottomed out"[5] in the hydraulic cylinder (thereby restoring hydraulic lock and, consequently, steering power) before the rudder could travel clear to the mechanical stop. Thus, Gulf-Tampa claims that this "bottoming out" would have prevented the rudder from ever reaching the mechanical stop under St. Philip's causation theory. Yet, it is undisputed that the rudder did hit the mechanical stop.
 
 
 13
 The District Court undertook to discount Gulf-Tampa's attack on St. Philip's theory by relying on testimony indicating that the Captain's attempts to regain steering power may have delayed the "bottoming out" of the ramrod with its attendant restoration of hydraulic lock. However, the Captain's testimony clearly indicates that he felt the rudder hit the stop before he took any corrective measures. Although the District Court's explanation is perhaps insufficient, we do not believe, upon a careful review of the evidence, that the insufficiency of this explanation renders St. Philip's causation theory implausible. In fact, the need to account for the rudder hitting the mechanical stop disappears upon a close examination of the evidence and exhibits. Gulf-Tampa's characterization of the testimony as showing that the ram would "bottom out" before the rudder could travel hardover to the mechanical stop is simply incorrect. The testimony and exhibits indicate that the position of the rams in the hydraulic cylinders corresponds to the position of the rudders--that is, when the rudders are at amidships the rams are in the middle of the cylinders. Therefore, when the rams are "bottomed out", the rudders will necessarily be hardover against the mechanical stop.
 
 
 14
 In any event, the testimony which Gulf-Tampa misinterprets was based on tests conducted when the steering system was fully functional. It is pure speculation that the rudders would react exactly the same way in the event of the separation of critical steering components. In fact, there is testimony in the record that, upon the separation of the ramrod from the rod eye, tremendous hydrodynamic forces pulled the rudders hardover almost instantly. Furthermore, the District Court found that just one day subsequent to the causalty in question, a faulty rod eye connection resulted in an involuntary hardover under substantially similar conditions. Although there was a factual dispute relating to the position of the rudders when the second steering failure occurred, the District Court credited Captain Ellison's testimony that the rudders were at or near amidships at the time of the second incident as well. Thus, there were two steering malfunctions, one day apart, both involving a separation of a rudder from its hydraulic system and both resulting in the rudders going hardover. This further undercuts Gulf-Tampa's argument that the floating ramrod would "bottom out" and restore hydraulic lock before the rudders went hardover to the mechanical stop.
 
 
 15
 For all these reasons, we conclude that the District Court's failure to sufficiently explain why the rudder hit the mechanical stop does not makes its acceptance of St. Philip's theory of the case implausible. A finding of fact is clearly erroneous only if, upon review of the entirety of the evidence, the reviewing court is left with a definite and firm conviction that a mistake has been committed. Anderson v. Bessemer City, 470 U.S. ----, ----, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518, 528 (1985). We are not so convinced. Therefore, we hold that the District Court was not clearly erroneous in finding that the separation of the ramrod from the rod eye was the cause of the steering casualty.
 
 Red Letter, Dead Letter
 
 16
 Prior to the trial, Gulf-Tampa moved for partial summary judgment seeking to limit its liability to $300,000 pursuant to a "red letter" clause which Gulf-Tampa claimed was part of its repair contract with St. Philip.
 
 
 17
 The relevant repairs were performed on the tug in October 1979, about three months prior to the casualty. Gulf-Tampa sent the invoice for those repairs to St. Philip on November 29, 1979. Gulf-Tampa claims that the invoice included an onion-skin cover sheet which contained the terms of the red letter clause.[6] Although St. Philip argues for various reasons that the red letter clause was not part of the repair contract,[7] we do not need to decide this question in light of our conclusion that the red letter clause does not limit Gulf-Tampa's liability. We assume that the clause was part of the contract.[8]
 
 
 18
 This case is controlled by the equitable principle of subrogation which has long been applied to admiralty:
 
 
 19
 The Chancellor is no longer fixed to the woolsack. He may stride the quarterdeck of maritime jurisprudence and, in the voice of admiralty judge, dispense, as would his landlocked brother, that which equity and good conscience impels.
 
 
 20
 Compania Anonima Venezolana De Navegacion v. A.J. Perez Export Co., 303 F.2d 692, 699 (5th Cir.1962), cert. denied, 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276 (1962).
 
 
 21
 After the owners of the CUNENE and the FROTALESTE sued St. Philip, St. Philip tendered Gulf-Tampa to the plaintiffs as an original defendant under F.R.Civ.P. 14(c).[9] Although St. Philip entered into a settlement agreement with the plaintiffs, St. Philip reserved their right to pursue subrogation recovery against Gulf-Tampa,[10] and Gulf-Tampa was subsequently found ultimately liable for the injury to the original plaintiffs, a finding which we affirmed in this appeal. It is undisputed that the red letter clause could not have limited Gulf-Tampa's direct liability to the original plaintiffs, who were not privy to the repair contract. Therefore, had St. Philip not entered into the settlement agreement with the original plaintiffs, there would be no doubt about the amount of Gulf-Tampa's direct liability to those plaintiffs--it would be $1,189,660.25, which represents the total damage to the two injured vessels and, of course, the amount St. Philip paid under the settlement agreement.
 
 
 22
 Because Gulf-Tampa could not have succeeded in limiting its liability had the original plaintiffs remained in the case subject to direct recovery from Gulf-Tampa under F.R.Civ.P. 14(c), it would be exalting form over substance to hold that, as a fortuitous and unintended consequence of the settlement agreement, Gulf-Tampa can now limit its liability to $300,000 because of the red letter clause. "[Subrogation] is administered so as to secure justice without regard to form, and applies in all cases in which one party ... pays a debt for which another is primarily liable, which in equity and good conscience should have been paid by the latter." Continental Casualty Co. v. Canadian Universal Insurance Co., 605 F.2d 1340, 1344 (5th Cir.1979), cert. denied, 445 U.S. 929, 100 S.Ct. 1317, 63 L.Ed.2d 762 (1980). Under subrogation principles, St. Philip, having paid the debt for which Gulf-Tampa was primarily liable, stands in the shoes of the original plaintiffs, who had a direct cause of action against Gulf-Tampa under F.R.Civ.P. 14(c) for the entirety of the damages. Therefore, on the facts of this case, the red letter clause should not limit St. Philip's recovery from Gulf-Tampa. St. Philip should recover the entire $1,189,660.25 which it paid to the original plaintiffs.
 
 
 23
 As a matter of policy, we think that any other conclusion would chill settlement negotiations in similar future cases. Using this case as an example, we do not think anyone could believe that St. Philip would have paid over $1 million in settlement to the original plaintiffs had it known that the party primarily liable could limit its "reimbursement" of St. Philip to $300,000. St. Philip would have avoided settlement and allowed the original plaintiffs to proceed directly against Gulf-Tampa under F.R.Civ.P. 14(c). Under Gulf-Tampa's view of the case, St. Philip would be out over $800,000 for having entered into the settlement agreement. We decline to adopt a rule with such a chilling effect on reasonable settlements.
 
 
 24
 In sum, we hold that the red letter clause does not limit Gulf-Tampa's liability to St. Philip for the damages suffered by the CUNENE and the FROTALESTE and paid for by St. Philip.
 
 
 25
 AFFIRMED.
 
 
 
 [1]
 The operator of the ALICE ST. PHILIP is St. Philip Offshore Towing Company. The owner is Agrico Shipping Company. Henceforth, the vessel, vessel owner and operator will be referred to collectively as "St. Philip."
 
 
 [2]
 St. Philip also filed third party complaints against Sperry Marine Systems, which designed the ALICE's steering system, and against Southern Shipbuilding Corporation, which built the ALICE. During the trial, all three third-party defendants moved for involuntary dismissal. The District Court denied Gulf-Tampa's motion but granted the motions of the other two defendants
 
 
 [3]
 The District Court found that none of Gulf-Tampa's assertions questioning the reasonableness of the settlement were supported by the evidence adduced at trial, and this issue has not been raised on appeal
 
 
 [4]
 Gulf-Tampa, although not conceding its correctness, has not challenged the District Court's finding that it negligently supplied and attached a severely worn rod eye to the tug's starboard rudder assembly during the October repairs
 
 
 [5]
 "Bottoming out" is the term used throughout this litigation to describe the position of the ram in the hydraulic cylinder when the ram is all the way to either end of the cylinder
 
 
 [6]
 Although Gulf-Tampa was unable to produce a copy of the genuine onion-skin cover letter sent to St. Philip on November 29, 1979, for the October repairs, Gulf-Tampa does have numerous copies of identical cover sheets which were attached to invoices sent to St. Philip for other work performed during approximately the same time period
 On the bottom front of the cover sheet was printed: PLEASE NOTE CONDITIONS ON BACK OF COVER SHEET AFFIXED TO ORIGINAL. The back of the sheet contained the following red letter clause:
 Furthermore, we undertake to perform work on and dry dock vessels and provide berth, wharfage, towage and other service and facilities only upon the condition that we shall not be liable in respect to any one vessel, directly or indirectly, in contract, tort or otherwise, to its owners, charterers or underwriters for any injury to such vessel, its cargo, equipment or movable stores, or for any consequences thereof, unless such injury is caused by our negligence or the negligence of our employees, and in no event shall our aggregate liability to all such parties in interest for damage sustained by them, as a result of such injury, exceed the sum of $300,000.
 
 
 [7]
 Apparently, St. Philip's key management personnel never saw the "red letter" clause because an employee in St. Philip's bookkeeping department disposed of the onion-skin cover sheets before routing the invoices through the appropriate management channels. St. Philip therefore argued that the red letter clause was not part of the repair contract, but the District Court side-stepped this issue and based its opinion on the language of the "red letter" clause, finding that the clause was not broad enough to limit liability for injuries suffered by third parties. We express no opinion on the correctness of the District Court's analysis, choosing instead to affirm on alternative grounds
 
 
 [8]
 In Alcoa Steamship Co. v. Charles Ferran & Co., 383 F.2d 46 (5th Cir.1967), cert. denied, 393 U.S. 836, 89 S.Ct. 111, 21 L.Ed.2d 107 (1968), we upheld the validity of a red letter clause as part of a repair contract. Specifically, we found that the practice in the industry and the prior relations between the parties was sufficient to put Alcoa on notice that the clause was implied in every repair contract. 383 F.2d at 55. However, since we assume that the clause was part of the contract in the case presently on appeal, we need delve into this issue no further
 
 
 [9]
 F.R.Civ.P. 14(c) was modeled on old Admiralty Rule 56. See F.R.Civ.P. 14 advisory committee note. An important feature of Admiralty Rule 56 was that it allowed impleader of any person who might be liable to the plaintiff. The importance of Rule 56 was that the defendant was entitled to insist that the plaintiff proceed to judgment against the third-party defendant. Id. Thus, consistent with traditional admiralty practice, Rule 14(c) allows impleader on a broader basis that Rule 14(a). The difference is highlighted by 3 J. Moore, Moore's Federal Practice p 14.34 at 14-156 (2d ed. 1985) (footnote omitted):
 A third-party defendant may be brought in [under Rule 14(c) ] not only on a theory of liability over to the third-party plaintiff for any recovery the original plaintiff may secure from such third-party plaintiff (the original defendant), but also on a theory that the third-party defendant is directly liable to the original plaintiff either jointly with the original defendant or instead of the original defendant.
 
 
 [10]
 The District Court, in its decree of August 18, 1982, expressly reserved St. Philip's rights to pursue subrogation recovery against third-party defendants