**Leopoldo SANDOVAL, Plaintiff,**

v.

**MITSUI SEMPAKU K. K. TOKYO, Defendant.**

**Civ. No. 2629.**

United States District Court
D. Canal Zone,
Cristobal Division.

Aug. 22, 1968.

E. J. Berger, Cristobal, Canal Zone, for plaintiff.

De Castro & Robles, Balboa, Canal Zone, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CROWE, District Judge.

This is an action in personam in admiralty by seaman-linehandler Leopoldo Sandoval against the owner-operator of the S.S. AKIBASAN MARU for damages in the amount of $100,000 for personal injury, permanent disability, loss and impairment of wages and other injuries, and $25,000 for maintenance and cure. The damages were incurred as a result of the plaintiff being struck by a cable or hawser aboard the vessel while it was entering Pedro Miguel Locks in the Panama Canal at about 10:00 p. m. on September 10, 1960 during a northbound transit. The action was brought under the Jones Act, general maritime law and the common law, and the plaintiff alleges a breach of seaworthiness and negligence, in particular in the first instance, incompetent fellow seamen and failure to provide the vessel with reasonably safe gear, equipment and appliances, and in the second instance, reasonably safe working conditions.

The defendant has denied that plaintiff was employed aboard this vessel as a seaman, that he is entitled to maintain the action, that he suffered his injuries or illness while aboard the vessel, that the vessel was unseaworthy or that the defendant was negligent and that the plaintiff's injuries were of the nature and extent claimed. As a separate and distinct defense, defendant alleges that the plaintiff proximately caused his injuries in attempting to jump over the cable and tripped on it, and further, that at the time that the plaintiff fell, the cable in question was not attached to the ship's winch or windlass and was entirely within the control of Panama Canal Company personnel, and that the defendant furnished the plaintiff with a safe place to work.

The plaintiff and his fellow workers were employees of the Panama Canal

Company and were handling the lines and cables to assist the defendant vessel in passing through the locks of the Panama Canal. While pulling the cable aboard the vessel from the mechanical towing mule or locomotive, which passes along a track on the wall of the Pedro Miguel Locks, and attempting to put the eye of the cable over a bitt on the ship, the cable was suddenly released, the plaintiff was hit by the loose end of the cable on the leg, and he fell upon the deck of the ship. As a consequence of the blow from the cable, plaintiff suffered a fracture of the right femur and of the greater trochanter. He thereafter was required to undergo surgery and extensive treatment and although still employed by the Panama Canal Company, is unable to pursue his regular line of work because of his inability to climb up and down the side of ships, and it appears that he will be permanently partially disabled.

## FINDINGS OF FACT

(THE FIRST TEN FINDINGS OF FACT ARE TAKEN FROM THE PRETRIAL CONFERENCE ORDER.)

1. The plaintiff at the time of the injury was employed by the Panama Canal Company and was engaged aboard the vessel as a seaman and linehandler for the transit of the vessel through the Canal subject to the orders of the Panama Canal Company boatswain.

2. The vessel is a single screw motor vessel about 500 feet long, it has a beam of 63 feet, a gross tonnage of about 6700 tons (net about 3800 tons) and was built about 1952.

3. The forward winch of the vessel was used to haul the messenger line and the cable from the locomotive on the center wall of the locks through a closed chock on the port side of the bow of the vessel for the purpose of facilitating the placing of the eye of the cable on a bitt on the port side aft of the bow.

4. The winch operator was a member of the crew of the vessel.

5. Plaintiff admits that Defendant's Exhibit A to the deposition of Captain Yoshio Ichikawa, dated January 4, 1966, is a substantially accurate diagram of the forward deck involved with relation to the ship's gear and equipment and in part 2 thereof of the position of the cable and of the plaintiff at the moment of the occurrence of the plaintiff's injuries.

6. Immediately before the occurrence of plaintiff's injuries, the cable "slipped forward" or slacked off and regressed through the chock.

7. At the time of the occurrence of plaintiff's injury, the eye of the cable had not been fastened to the bitt.

8. As the result of the injuries incurred aboard the vessel, plaintiff was initially hospitalized for 177 days and discharged with a diagnosis of fracture of the right femur proximal and fracture of the greater trochanter and was treated with the operative procedure of the insertion of a Kirschner pin, right tibia, and application of Thomas splint, traction, and fitted with Ischael weight bearing brace before discharge. At the time of trial, he had been an in-patient at Gorgas Hospital for a total of 439 days since the incident and has been treated there as an out-patient during the same period 89 times.

9. The total cost of medical attention and care for plaintiff as the result of his injuries on September 10, 1960 amounts to $17,617.00, all provided by the Panama Canal Company, and presently no claim against plaintiff has been made by the company for payment.

10. Plaintiff has received the sum of $3,036.16 from the Panama Canal Company as workmen's compensation.

11. At all material times plaintiff was a seaman or deckhand linehandler employed by the Panama Canal Company and his duties were to board vessels

transiting the Panama Canal and to secure lines connecting towing locomotives on the walls of the locks with the vessels. At the time he received the injuries concerned in his complaint, he had six years experience on the job and was 46 years of age.

12. The defendant is a Japanese corporation and at all times material hereto owned and operated the S.S. AKIBASAN MARU of Japanese registry.

13. The standard procedure to secure the cables of locomotives to vessels in the locks was to use a number of teams of four linehandlers each, furnished by the Panama Canal Company aboard the vessel. When the vessel approached the locks, a half inch manila heaving line aboue 150 feet in length was thrown from the vessel to a dinghy in the Canal and this line was tied to a manila messenger line about an inch and a half in diameter and about 200 feet in length tied at the other end to the cable from the locomotive. The heaving line was brought aboard by hand through a closed chock and the messenger line was connected by turns on the ship's winch to haul in the cable from the locomotive. The cable was made of metal and was about an inch and three eighths in diameter and the end of the cable brought aboard formed an eye or loop about three and a half feet in length which was secured to the vessel by capping it on a bitt.

14. Under the standard procedures, a member of the ship's crew operated the winch, not the linehandlers. One member of the linehandler team would take turns of the messenger line on the barrel or drum of the winch; one would lift the eye and cap the cable on the bitt, and two would hold the cable by hand when the eye was at the bitt because there would be a strain on the cable due to its weight. The cable, hauled in by the winch, would be stopped when the eye was about a foot beyond the bitt and the capper would secure the eye on the

bitt; the nearer the eye was brought to the bitt mechanically, the less manual effort was required. One of the linehandlers would usually give the signal or instruction to the winch operator when to stop the winch or sometimes the capper or the Canal boatswain or those holding the cable, but sometimes the winch operator would stop of his own accord before the eye hit the bitts; if the winch stopped before the Canal seamen held the cable, the cable would back out. If the winch operator did not speak English or Spanish, hand signals would be improvised to indicate when to stop or start the ship's winch. The linehandler at the winch connected the messenger line to the barrel of the winch by either an inside turn in which the turn is inside of the lead from the cable, that is, between the lead from the cable and the outer edge of the drum; the outside turn is easier to remove than the inside turn.

15. At 1824 (6:24 p. m.) on September 10, 1960 the AKIBASAN MARU arrived at the anchorage for a northbound transit just outside the Canal and about 10 miles from the first lock. The vessel anchored at the anchorage. The pilot, Captain Hay, boarded the vessel at 1900 (7:00 p. m.) and the vessel entered the channel at 1940 (7:40 p. m.). The linehandlers consisting of 16 men (4 teams) including the plaintiff, and the Canal boatswain, Mr. Heron, boarded the vessel in front of Pier 18 in the Basin about 2000 (8:00 p. m.) and it was dark. Mr. Heron on coming aboard checked the forecastle deck and other parts of the vessel and found no unsafe conditions and found no mud or grease on the deck although he did not inspect the ship's anchor chains in the bow either on boarding or later. The vessel was equipped with manually operated valve to flush the hawse pipe and clean the anchor chain, but the testimony adduced showed it was used about 2:00 or 3:00 o'clock the day of the incident while it was light and not dark. After clearing the first locks at Miraflores, the vessel arrived at the east chamber of Pedro Miguel at 2150

(9:50 p. m.). The center wall extends about 1000 feet further south than the outer walls and the lines on the portside of the vessel at the bow were readied.

16. The linehandlers at the bow of the vessel were the plaintiff and Saayedra as holders, Ortega as capper, and Avilla, the messenger linehandler at the winch. K. Hayashi, a member of the ship's crew, operated the winch; he was the ship's carpenter and did not understand English or Spanish. The messenger line was rigged from the chock at the bow around the bitt to the left side of the winch selected to secure the eye, thence to the drum of the winch where Avilla had an inside turn on it. When the eye of the cable neared the bitt and Ortega was about to cap the bitt, Avilla slacked off on the messenger line around the drum of the winch but he did not disconnect or remove the line from the winch. The winch operated by Hayashi, stopped but no one told him to do so. As the linehandlers Sandoval and Saayedra held the cable, Saayedra got a splinter or burr in his hand from the cable and he let go for a while. The cable, under the strain of its weight from the higher locomotive, receded through the chock. Sandoval held on momentarily, slipped and fell to the deck and was hit by the cable. Avilla stopped the cable by taking a turn of the messenger line on the winch drum after the cable had gone forward; the messenger line had not been removed from the winch and Avilla could only snub the line to prevent the cable from slipping back, but without the use of the winch rotating, he could not bring the cable forward.

17. The deck of the forecastle at the time of the accident was wet from light rains or "dew" but the preponderance of the evidence shows that the deck was clean and there was no muck or mud or grease or oil on it.

18. The AKIBASAN was equipped with devices for washing the anchor chains in the hawse pipes as the anchors were heaved aboard and on leaving the Balboa anchorage on September 10, 1960 prior to commencing the northbound transit in this case, the anchor chains were washed as they came up on deck.

19. The illumination of the forecastle deck came from lights on the center wall of the lock on posts from 18 to 22 feet in height, sufficient to enable one to read the headlines of a newspaper. The Canal boatswain carried a flashlight but bright lights were not permitted on deck. There was one light on a mast on the vessel and there were two 500 watt lights on a mast back of the bridge about five or six meters above deck but they were not being used. During the year 1960, Panama Canal Pilots required that foredecks of ships under their con in the Canal be not illuminated too brightly so as to retain their proper visibility of the channel and the locks and waters.

20. The only evidence submitted of any contributory negligence on the part of plaintiff was inconclusive and uncertain.

21. The linehandlers and boatswain employed by the Panama Canal Company who boarded the vessel were compulsory in that the defendant could not choose other personnel to assist its own crew in handling towing wires in the transit. The defendant did not have the power of using its own personnel except as permitted by the Panama Canal Company. 35 CFR 109.4.

22. At the time of the plaintiff's injury the ship's winch was not in operation and there was no negligence of the ship's winch operator which proximately caused or contributed to plaintiff's fall or injury.

## CONCLUSIONS OF LAW

The following conclusions were determined after oral argument by counsel for the parties. No briefs were submitted.

1. This Court has jurisdiction of the action.

2. The proximate cause of the injury was that the linehandler, Saayedra, "got a splinter or burr in his hand from the cable and he let go for awhile" and the weight of the cable was so great that the plaintiff was pulled suddenly toward the chock and caused to let go as he slipped and fell to the deck. The heavy cable, which at that point had not been checked by the messenger line which was still around the drum of the winch, struck him causing the fractures of which he complains.

■ 3. The linehandler, Saayedra, was an employee of the Panama Canal Company and the defective cable was that company's property. The evidence is that the "splinter or burr" from the cable caused Saayedra to let go. The letting go of the cable as a result of the injury to Saayedra by the defect in it created the "instantaneous unseaworthiness" of the vessel that damaged plaintiff and he is entitled to recover from the defendant. Mascuilli v. United States, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743; Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561.

"This protection against unseaworthiness imposes a duty which the owner of the vessel cannot delegate. Seas Shipping Co. v. Sieracki, supra, [328 U.S. 85] at 100 [66 S.Ct. 872, at 880]. Unseaworthiness extends not only to the vessel but to the crew (Boudoin v. Lykes Bros. Steamship Co., 348 U.S. 336 [75 S.Ct. 382, 99 L.Ed. 354]) and to appliances that are appurtenant to the ship. Mahnich v. Southern S. S. Co., 321 U.S. 96 [64 S.Ct. 455, 88 L.Ed. 561]. And as to appliances the duty of the shipowner does not end with supplying them; he must keep them in order. Id., at 104 [64 S.Ct. at 459]; The Osceola, 189 U.S. 158, 175 [23 S.Ct. 483, 487, 47 L.Ed. 760]. The shipowner is not relieved of these responsibilities by turning control of the loading or unloading of the ship over to a stevedor-ing company. It was held in Grillea v. United States, [2 Cir.] 232 F.2d 919, that stevedores themselves could render a ship *pro tanto* unseaworthy and make the vessel owner liable for injuries to one of them. And see Rogers v. United States Lines, 347 U.S. 984 [74 S.Ct. 849, 98 L.Ed. 1120]; Alaska S. S. Co. v. Petterson, 347 U.S. 396 [74 S.Ct. 601, 98 L.Ed. 798]." Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413. See also Boleski v. American Export Lines, Inc., 4 Cir., 385 F.2d 69 (1967); Candiano v. Moore-McCormack Lines, Inc., 2 Cir., 382 F.2d 961 (1967).

■ 4. The fact that plaintiff and Saayedra were employed by the Panama Canal Company instead of the defendant does not prevent plaintiff from recovering from the defendant. Although plaintiff and defendant were not called "stevedores" they were engaged in work that was seaman's work and that had to do with the propulsion and movement of the ship, so the rule as stated in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, is applicable.

"Running through all of these cases, therefore, to sustain the stevedore's recovery is a common core of policy which has been controlling, although the specific issue has varied from a question of admiralty jurisdiction to one of coverage under statutory liability within the admiralty field. It is that for injuries incurred while working on board the ship in navigable waters the stevedore is entitled to the seaman's traditional and statutory protections, regardless of the fact that he is employed immediately by another than the owner. For these purposes he is, in short, a seaman because he is doing a seaman's work and incurring a seaman's hazards. Moreover, to make the policy effective, his employer is brought within the liability which is peculiar to the employment relation to the extent that and because he also undertakes the service of the ship.

It would be anomalous if such a policy, effective to control such issues, were less effective when the question is simply whether the stevedore is entitled to the traditional securities afforded by the law of the sea to men who do the ship's work. Nor does it follow from the fact that the stevedore gains protections against his employer appropriate to the employment relation as such, that he loses or never acquires against the shipowner the protections, not peculiar to that relation, which the law imposes as incidental to the performance of that service. Among these is the obligation of seaworthiness. It is peculiarly and exclusively the obligation of the owner. It is one he cannot delegate. By the same token it is one he cannot contract away as to any workman within the scope of its policy. As we have said, he is at liberty to conduct his business by securing the advantages of specialization in labor and skill brought about by modern divisions of labor. He is not at liberty by doing this to discard his traditional responsibilities. That the law permits him to substitute others for responsibilities peculiar to the employment relation does not mean that he can thus escape the duty it imposes of more general scope. To allow this would be, in substantial effect, to convert the ancient liability for maritime tort into a purely contractual responsibility. This we are not free to do."

In Pope & Talbot Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 the Court held that Hawn doing carpentry work although not a "stevedore" and not engaged in loading the vessel and not an employee of the ship was entitled to the protection from unseaworthiness equally with stevedores or seamen and therefore could recover. *

This reasoning is completely applicable to the question of the defective cable. The cable was not the property of the defendant but he cannot escape liability for the damage done by reason of its defect any more than he can escape the traditional responsibility to seaman by contracting for personnel. He decided to use the canal to take advantage of the savings accruing as a result of cutting between the continents rather than the long voyage around Cape Horn. In making this decision he embraced the regulations imposed by the Panama Canal Company which required the use of certain personnel and equipment as a part of the contract of transit. As has been said if he could shift his traditional responsibility of seaworthiness, it would convert the ancient liability for maritime tort into a purely contractual responsibility. In Petterson v. Alaska S. S. Co., 9 Cir., 205 F.2d 478 affirmed in Per Curiam decision, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, the Circuit Court held that when a stevedore employed by an independent contractor is injured while working on board ship when a block brought on board by the independent contractor breaks, the ship owner is absolutely liable under the doctrine of unseaworthiness.

5. The plaintiff was not guilty of contributory negligence.

 6. Defendant complains that to find the ship unseaworthy and make it liable would be unfair and create an inequity as the Panama Canal Company under the Workmen's Compensation Contract with plaintiff would have the right of indemnification from plaintiff and thus would be recompensated in spite of its own wrong. The fact that the defendant failed to implead the Panama Canal Company is no fault of the plaintiff. It could have done so and thus protected itself. States S. S. Co. v. Rothschild Int. Steve. Co., 9 Cir., 205 F.2d 253. Defendant complains that no investigation of the accident was had nor claim made against the Panama Canal Company before sailing in accordance with 2 Canal Zone 297 therefore it could not be impleaded nor recovery had from

it in an action filed thereafter. This is not plaintiff's fault either and is a statutory duty of which defendant and its agent in the Canal Zone should be well aware. Even though the plaintiff is precluded from bringing an action against the Panama Canal Company as a result of his election to take under the Workmen's Compensation Contract, he still can proceed against the ship in rem or the defendant herein in personam. Watson v. Gulf Stevedore Corp., 5 Cir., 374 F.2d 946 (1967).

7. 35 CFR 109.4 is as follows: Locomotives; Canal deckhands.

The Canal authorities are authorized to prescribe:

(a) The number of towing locomotives and wires required in the locks by a transiting vessel, depending upon her length, beam, displacement, and special conditions; and

(b) The number of Canal deckhands to be placed on board a transiting vessel to assist her crew in handling towing wires in the locks.

■ This regulation leaves no choice of line handling crews to the defendant which must accept Panama Canal Company personnel and equipment if it wishes to transit the Canal. Defendant complains that the "compulsory" use of the Panama Canal Company's personnel creates an unfair situation but there is no showing that this affected the matter in any way nor does it differ much from the stevedore cases in the United States for there the choice of stevedores is governed by the unions.

8. The defendant is liable for the damages resulting to plaintiff under general maritime law for unseaworthiness.

The parties agreed, and it was made a part of the pretrial conference order, that the issue of liability should be tried first and upon a determination of liability on the part of the defendant the case would be then set down for a further hearing and the case is therefore continued for further orders.