460 F.2d 1163
 17 A.L.R.Fed. 479
 Leopoldo SANDOVAL, Plaintiff-Appellee-Cross Appellant, and
Panama Canal Company, Intervenor-Appellee-Cross Appellant,
v.
MITSUI SEMPAKU K. K. TOKYO, Defendant-Appellant-Cross Appellee.
 No. 71-1699.
 United States Court of Appeals,
Fifth Circuit.
 May 23, 1972.
Rehearing Denied June 16, 1972.
 
 E. J. Berger, Cristobal, Canal Zone, Jacob Rassner, New York City, for appellee-appellant.
 Woodrow De Castro, Balboa, Canal Zone, Winston Edward Rice, New Orleans, La., for Mitsui Sempaku K. K. Tokyo; Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., and Kirlin, Campbell & Keating, and John R. Geraghty, New York City, of counsel.
 De Castro & Robles, Balboa, Canal Zone, for plaintiff-in-intervention-appellant-appellee.
 Dwight A. McKabney, Robert J. Park, Office of General Counsel, Panama Canal Co., Balboa Heights, Canal Zone, John L. Haines, Jr., Balboa Heights, Canal Zone, for Panama Canal Co.
 Before GEWIN, AINSWORTH and SIMPSON, Circuit Judges.
 AINSWORTH, Circuit Judge:
 
 
 1
 On the evening of September 10, 1960, Leopoldo Sandoval and his fellow Panama Canal Company employees boarded Mitsui's vessel AKIBASAN MARU shortly after the vessel began her northbound transit of the Panama Canal. No vessel may transit the Canal without the Canal Company's pilot and linehandling crew, unless special permission is granted by the Canal Company. 35 C.F.R. Sec. 109.4.[1] At the time of Sandoval's injury, the AKIBASAN MARU was being prepared by the Canal Company to pass through the Pedro Miguel Locks. The vessel was to be guided by mechanical towing mules or locomotives which travel along a track on the lock walls. A heavy steel cable ran from the vessel to the mules. Sandoval was injured while he and three other linehandlers were attempting to secure the eye or loop at the end of the bow line to a bitt on the vessel.
 
 
 2
 Standard procedure called for a halfinch manila "heaving line" to be thrown from the vessel to a dinghy in the Canal. The "heaving line" was in turn tied to a manila "messenger line" which connected to the steel cable. Once the lines were connected, the heaving line was retrieved by hand, bringing with it the first part of the messenger line. The messenger line and the steel cable were then brought aboard using the ship's winch. As the eye was brought close to the bitt, Sandoval and his partner took hold of the steel cable to ease the tension so that the eye could be placed on the bitt. While Sandoval and his partner held the cable, but before the eye was placed on the bitt, Sandoval's partner, Saayedra, got a splinter or burr from the cable in his hand causing him to drop the cable. Sandoval held on for a moment but then fell and was struck by the cable. As a result he suffered injuries to his right leg and foot.
 
 
 3
 Sandoval's right to recover from Mitsui was first established in a nonjury trial confined to the issue of liability. The Court found that a burr or splinter in the cable rendered the vessel unseaworthy. See Sandoval v. Mitsui Sempaku K. K. Tokyo, D. Canal Zone, 1968, 288 F.Supp. 377. Subsequently, the Canal Company intervened as a complainant to recover from Mitsui the value of compensation benefits paid to Sandoval pursuant to the Federal Employees Compensation Act, 5 U.S.C. Sec. 8101 et seq. Mitsui counterclaimed against the Canal Company seeking indemnity for all sums it was adjudged liable to Sandoval. Both parties moved for summary judgment on the indemnity issue.
 
 
 4
 On May 22, 1970, the District Court entered findings of fact and conclusions of law fixing Sandoval's damages against Mitsui in the amount of $60,092.08. The Court also held that Mitsui was not entitled to indemnity from the Canal Company. See Sandoval v. Mitsui Sempaku K. K. Tokyo, D. Canal Zone, 1970, 313 F.Supp. 719.
 
 
 5
 On January 11, 1971, the District Court entered formal judgment in favor of Sandoval against Mitsui in the amount of $60,092.08. The Court granted the Canal Company's motion for summary judgment on the issues of indemnity and dismissed Mitsui's counterclaim, 316 F.Supp. 237. The Court also ordered that Sandoval's private fee arrangement with his attorney be given effect by the Court and refused intervenor Canal Company's demand that the amount of the fee be reduced. The Court further ordered "that in determining intervenor's right to a refund of compensation benefits paid by it to plaintiff (which right arises under 5 U. S.C. Sec. 8132) the reasonable attorney's fee within the meaning of said Sec. 8132 shall be 33 1/3% unless appeal is taken in which case it shall be 40%." Finally, the Court denied a motion by Sandoval to tax his attorney's fees against defendant Mitsui as costs of the suit.
 
 
 6
 None of the parties is completely satisfied with the judgment and all parties have appealed. Mitsui contends that the judgment is erroneous in all respects except insofar as it rejected Sandoval's motion to tax attorney's fees as costs. Sandoval claims that the judgment was erroneous in failing to tax attorney's fees as costs and that the amount of damages awarded him was inadequate. He also seeks to have us award prejudgment interest. Mitsui argues that the issue of prejudgment interest was never presented to the Trial Court in the first instance and is therefore waived. The Canal Company appeals the issue of Mitsui's liability to Sandoval but seeks to preserve the judgment denying indemnity to Mitsui. The Canal Company also claims error in the District Court's calculation of the amount due to it for compensation benefits paid to Sandoval. We affirm in part; reverse in part; and remand for further proceedings not inconsistent herewith.
 
 I.
 SANDOVAL'S CLAIM AGAINST MITSUI[2]
 
 7
 At the time of his injury, Sandoval was engaged in classic seaman's work of handling the lines of the vessel. He was, therefore, owed the warranty of seaworthiness by the vessel and its owner. See Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), reh. denied, 328 U.S. 878, 66 S.Ct. 1116, 90 L.Ed. 1646 (1946), and Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953). The defective cable belonged to the Canal Company and was being handled by its employees. But when the equipment was brought aboard the AKIBASAN MARU to aid in the vessel's navigation it became ship's tackle rendering Mitsui absolutely responsible for any unseaworthy condition created by it. See Alaska Steamship Company v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L. Ed. 798 (1954). See also Ryan Stevedor. Co. v. Pan-Atlantic Steam. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956).
 
 
 8
 The District Court concluded that a splinter or burr existed in the steel cable and that the defect rendered the vessel unseaworthy. The Court found that "The proximate cause of the injury was that the linehandler, Saayedra, 'got a splinter or burr in his hand from the cable and he let go for awhile' and the weight of the cable was so great that the plaintiff was pulled suddenly toward the chock and caused to let go as he slipped and fell to the deck. The heavy cable, which at that point had not been checked by the messenger line which was still around the drum of the winch, struck him causing the fractures of which he complains." 288 F.Supp. at 382. A seaworthy vessel is one "reasonably suitable for her intended service." Mitchell v. Trawler Racer Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 933 (1960). "[T]he doctrine is a growing concept, constantly undergoing redefinition as the risks of those protected are enlarged by changing technology and ship board technique." Dillon v. M. S. Oriental Inventor, 5 Cir., 1970, 426 F.2d 977, 979. The District Court's conclusions that the AKIBASAN MARU was unseaworthy on account of the defective cable, and that that unseaworthiness proximately caused Sandoval's injuries, are not clearly erroneous. See Fed.R.Civ.P. 52(b); Chaney v. City of Galveston, 5 Cir., 1966, 368 F.2d 774; Nelson v. Jacksonville Shipyards, Inc., 5 Cir., 1971, 440 F.2d 668, 670.
 
 
 9
 Nevertheless, Mitsui argues that the presence of the Panama Canal linehandlers, bosun, and pilot constituted compulsory pilotage, and accordingly, Mitsui may not be adjudged responsible in personam for their negligence.[3] However, the conclusion of the District Court that the vessel was itself unseaworthy because of defective equipment was the basis of his determination of liability. The Court finally concluded that "the unseaworthiness was more than instantaneous and existed as long as the defective cable was on board." Id., 313 F. Supp. at 723. The conclusion is correct and amply supported by the record. See Alaska Steamship Company v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954). See also Rogers v. United States, 5 Cir., 1971, 452 F.2d 1149.
 
 
 10
 Finally, Sandoval appeals the issue of damages. The District Court awarded judgment in the amount of $60,092.08. Appellant states in his brief that he "does not claim that the finding by the Court below as to the amount of damages was clearly erroneous, as called for by the holding of the Supreme Court of the United States in the case of McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6 [99 L.Ed. 20], but respectfully asks that this Honorable Court consider increasing the award in an amount comparable to that generally allowed by Courts and juries for similar injuries." This Court is not at liberty to disturb findings of fact made by the District Court unless they are clearly erroneous, which is not the case here. See Rule 52(b), Fed.R.Civ.P.
 
 II.
 
 11
 MITSUI'S CLAIM FOR INDEMNITY AGAINST THE PANAMA CANAL COMPANY
 
 
 12
 The factual basis for Mitsui's claim for indemnity against the Canal Company is clearly established by the record. Canal Company employees were aboard the AKIBASAN MARU to assist the vessel through the Panama Canal locks; Mitsui paid a toll for the service; the Canal Company's gear was defective; the defective gear caused Sandoval's injuries; and Mitsui was not guilty of any conduct sufficient to preclude indemnity.
 
 
 13
 Mitsui's claim was based on both tort and implied contractual or warranty theories of indemnity. The Canal Company argues that it cannot owe indemnity resulting from a breach of warranty of workmanlike service because of the absence of the requisite contractual relationship between the shipowner and the Canal administration. The United States owns and operates the Panama Canal as an international waterway. Under the terms of treaties with Great Britain and Panama, the United States has an obligation to keep the Canal open to vessels of commerce and of war of all nations on terms of entire equality and without discrimination in respect of the conditions or charges of traffic, which are required to be just and equitable. Hay-Pauncefote Treaty, Feb. 21, 1902, 32 Stat. 1903; Hay-Bunau Varilla Treaty, Feb. 26, 1904, 33 Stat. 2234. Congress has provided that the Canal shall be maintained and operated by the Panama Canal Company, a corporate instrumentality of the United States. 2 C. Z.C. Sec. 61(a). The Company has the right to sue and be sued in its corporate name, 2 C.Z.C. Sec. 65(a) (3), and to enter into contracts, leases, agreements, or other transactions. 2 C.Z.C. Sec. 65(a) (4). The authority to prescribe conditions and regulations governing passage and control of vessels through the Canal, including the locks and approaches thereto is vested in the President of the United States, 2 C.Z.C. Sec. 1331(2), who is the sole "stockholder" of the Company and who represents the United States in its capacity as owner of the Company. 2 C.Z.C. Sec. 62(b). The President has delegated by executive order to the Secretary of the Army authority over passage of vessels through the Canal. 35 C.F.R. Sec. 3.1(a) (1).
 
 
 14
 Under the Ryan Doctrine,[4] one who performs maritime services for a shipowner impliedly warrants that he will perform the services in a workmanlike manner. When breach of that obligation renders the vessel unseaworthy and imposes absolute liability on the owner for the consequences of that unseaworthiness, the party must indemnify the shipowner on account of its breach. See Ryan Stevedor. Co. v. Pan-Atlantic Steam. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956); Weyerhaeuser S. S. Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958); Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Company, 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed. 2d 732 (1964). The numerous policy considerations underlying the Ryan Doctrine have been thoroughly examined elsewhere and need not be reiterated here. See Hobart v. Sohio Petroleum Company, 5 Cir., 1971, 445 F.2d 435; Loffland Brothers Company v. Roberts, 5 Cir., 1967, 386 F.2d 540, 549, cert. denied, 389 U.S. 1040, 88 S.Ct. 778, 19 L. Ed.2d 830 (1968); Centraal Stikstof Verkoopkanter N. V. v. Walsk Steve. Co., 5 Cir. 1967, 380 F.2d 523, 528-529; Ocean Drilling & Exp. Co. v. Berry Bros. Oilfield Service, 5 Cir., 1967, 377 F.2d 511, 513, cert. denied, 389 U.S. 849, 88 S.Ct. 102, 19 L.Ed.2d 118 (1967); Smith Petroleum Service, Inc. v. Monsanto Chemical Co., 5 Cir., 1970, 420 F. 2d 1103; Delta Engineering Corporation v. Scott, 5 Cir., 1963, 322 F.2d 11, cert. denied, 377 U.S. 905, 84 S.Ct. 1164, 12 L.Ed.2d 176 (1964); Whisenant v. Brewster-Bartle Offshore Company, 5 Cir., 1971, 446 F.2d 394. It suffices to say that those considerations apply fully to the situation in this case.
 
 
 15
 Mitsui is likewise entitled to indemnity from the Canal Company on a tort indemnity basis because the Company violated a duty owed directly to the shipowner to exercise reasonable care to avoid the foreseeable harm of the shipowner's liability to Sandoval. See Tri-State Oil Tool Indus., Inc. v. Delta Marine Drill. Co., 5 Cir., 1969, 410 F.2d 178, noted 44 Tul.L.Rev. 557, and cases cited therein. See also Federal Marine Term., Inc. v. Burnside Ship. Co., 394 U.S. 404, 421, 89 S.Ct. 1144, 1153-1154, 22 L.Ed.2d 371 (1969).
 
 
 16
 The District Court concluded, however, that Mitsui could not recover indemnity against the Panama Canal Company without compliance with the provisions of 2 C.Z.C. Sec. 297,[5] and that Mitsui had not complied. 313 F.Supp. at 725. We hold that the District Court's conclusion is clearly erroneous because the record shows that Mitsui complied with the provisions of Section 297. The Canal Company's pilot was in command of the AKIBASAN MARU during the transit of the Canal. He testified that the vessel's master reported the accident to him immediately after it occurred. A boatswain employed by the Canal Company, who was in charge of the linehandlers including Sandoval, testified that he also notified the pilot and filled out the Company's accident form immediately after the accident. Canal Company employees were eyewitnesses to the accident. In short the evidence is conclusive that the Canal Company was on notice of Sandoval's injury and that it had ample opportunity to investigate the accident. Its investigators in fact prepared a report. However, the report could not be located by the Canal Company at the time of trial. But the Canal Company had paid Sandoval over $24,006 in compensation benefits as a result of his injury aboard the AKIBASAN MARU. Reason dictates that the Company was fully informed of the occurrence. As Chief Judge Brown stated in Gulf Oil Corporation v. Panama Canal Company, 5 Cir. 1969, 407 F.2d 24, 32. "A reasonable interpretation produces a reasonable result. An unreasonable interpretation produces a harsh absurdity." We decline to sanction such a result here.
 
 
 17
 Finally, the District Court concluded that Mitsui was foreclosed from seeking indemnity because the Federal Employees Compensation Act is the exclusive remedy available against the Company for those entitled to benefits of the Act. This identical argument was rejected by the Supreme Court in Weyerhaeuser Steamship Company v. United States, 372 U.S. 597, 601-604, 83 S.Ct. 926, 929-930, 10 L.Ed.2d 1 (1963). See also Ryan Stevedor. Co. v. Pan-Atlantic Steam. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956).
 
 III.
 THE CANAL COMPANY'S COMPENSATION CLAIM
 
 18
 The Canal Company intervened to recover in excess of $24,006 it paid to Sandoval pursuant to the Federal Employees Compensation Act, 5 U.S.C. Secs. 8101-50,[6] on account of his injury aboard the AKIBASAN MARU. It claims that the District Court erred in refusing to decide whether the contract between Sandoval and his lawyer provides for an attorney's fee that is "reasonable" within the meaning of Section 8132 of the Act, and that the Court erred in holding that the Canal Company's claim must be reduced by an amount equal to 40 per cent of its claim, which sum would be payable to Sandoval's attorney. We agree with the Canal Company on both points.
 
 
 19
 Section 8132, 5 U.S.C. Sec. 8132, defines the manner of distribution of funds recovered by compensation beneficiaries in actions against third persons. The statute provides:
 
 
 20
 "Sec. 8132. Adjustment after recovery from a third person.
 
 
 21
 "If an injury or death for which compensation is payable under this subchapter is caused under circumstances creating a legal liability in a person other than the United States to pay damages, and a beneficiary entitled to compensation from the United States for that injury or death receives money or other property in satisfaction of that liability as a result of suit or settlement by him or in his behalf, the beneficiary, after deducting therefrom the costs of suit and a reasonable attorney's fee, shall refund to the United States the amount of compensation paid by the United States and credit any surplus on future payments of compensation payable to him for the same injury. The amount refunded to the United States shall be credited to the Employees' Compensation Fund. If compensation has not been paid to the beneficiary, he shall credit the money or property on compensation payable to him by the United States for the same injury. However, the beneficiary is entitled to retain at least one-fifth of the net amount of the money or other property remaining after the expenses of a suit or settlement have been deducted, plus an amount equivalent to a reasonable attorney's fee proportionate to the refund to the United States."[7]
 
 
 22
 The Canal Company claims that Sandoval's attorney had a fee arrangement providing for a contingent fee, which is excessive. The District Court refused to allow an inquiry into that arrangement regarding it solely as a matter between Sandoval and his attorney. We hold that determination of the amount of a "reasonable attorney's fee" is a matter for the Court. The "reasonable attorney's fee" provision of Section 8132 governs distribution of funds resulting from judgment or settlement with a third party. First, it guarantees complainant's counsel at least a "reasonable" fee payable out of the judgment or settlement fund. Second, the amount of the fee is the key factor in the calculation of the complainant's guaranteed minimum share as provided in the final sentence of Section 8132.[8] The attorney may not obtain more than a reasonable fee and the parties are not free to eliminate the word "reasonable" from the statute by private contract.
 
 
 23
 The Supreme Court Appellate Division, First Department of the State of New York, has established maximum contingency fees for "attorneys and counselors at law who have their offices in the first judicial department." Rules of the Supreme Court Appellate Division, First Department, Local Rule 603.1. Sandoval's attorney was subject to those rules, the pertinent parts of which are set out in a footnote.[9] The value of an attorney's services according to the custom or rule in the place of his practice is a factor which is entitled to substantial weight in ascertaining the value of a "reasonable" fee under Section 8132. The Canal Company argues that a 25 per cent contingent fee would be reasonable here, by analogy to the Federal Tort Claims Act, 28 U.S.C. Sec. 2678. However, considering the fact that suits were filed for Sandoval in two different jurisdictions (New York and the Canal Zone), the litigation has extended over a period of years and the practice of counsel's home jurisdiction, we hold that a one-third contingency fee meets the test of reasonableness under Section 8132.
 
 
 24
 Section 8132 also creates the formula for calculation of Sandoval's share and the Canal Company's share in the net proceeds of the judgment. After deducting costs and the attorney's fee, Sandoval must refund to the Canal Company the total amount of compensation benefits paid to Sandoval, unless to do so would impinge on Sandoval's guaranteed minimum share. In case of such impingement, the Canal Company's claim must be reduced so as to allow Sandoval his guaranteed minimum share.[10] The final distribution is left for calculation by the District Court on remand of this cause,[11] and shall not be inconsistent with this opinion.
 
 IV.
 TAXING SANDOVAL'S ATTORNEY'S FEES AS COSTS
 
 25
 The District Court neither erred nor abused its discretion in refusing to tax Sandoval's attorney's fees as costs. See Ballwanz v. Jarka Corporation of Baltimore, 4 Cir., 1967, 382 F.2d 433, 435; American Union Transport Co. v. Aguadilla Terminal, Inc., 1 Cir., 1962, 302 F.2d 394, 396. Cf. Utah v. United States, 10 Cir., 1962, 304 F.2d 23, 27, cert. denied, 371 U.S. 826, 83 S. Ct. 47, 9 L.Ed.2d 65 (1962).
 
 V.
 THE INTEREST ISSUE
 
 26
 Sandoval claims for the first time on appeal that he is entitled to have interest taxed as costs from the time of institution of the action until the judgment is paid. Post-judgment interest is of course automatically awarded, whether or not judgment so provides. 28 U.S.C. Sec. 1961. Claims for prejudgment interest in admiralty cases, however, are addressed to the sound discretion of the District Court. Canova v. Travelers Insurance Company, 5 Cir., 1969, 406 F.2d 410, cert. denied, 396 U. S. 832, 90 S.Ct. 88, 24 L.Ed.2d 84 (1969); National Marine Service, Inc. v. Talley, 5 Cir., 1965, 348 F.2d 589; Carl Sawyer, Inc. v. Poor, 5 Cir., 1950, 180 F.2d 962. Here, "It is unnecessary to explore the question as the record fails to indicate even remotely that it was presented to the trial court in any manner or at any juncture. It is raised initially on appeal. That cannot be done." American Home Fire Assur. Co. v. Hargrove, 10 Cir., 1940, 109 F.2d 86, 87.
 
 
 27
 Affirmed in part; reversed in part; and remanded for further proceedings not inconsistent herewith.
 
 
 
 [1]
 35 C.F.R. 109.4 provides:
 "Locomotives; Canal deckhands.
 "The Canal authorities are authorized to prescribe:
 (a) The number of towing locomotives and wires required in the locks by a transiting vessel, depending upon her length, beam, displacement, and special conditions; and
 (b) The number of Canal deckhands to be placed on board a transiting vessel to assist her crew in handling towing wires in the locks."
 The District Court noted that "This regulation leaves no choice of line handling crews to the defendant which must accept Panama Canal Company personnel and equipment if it wishes to transit the Canal." 288 F.Supp. at 384.
 
 
 [2]
 The issues concerning indemnity, attorney's fees, and interest will be treated under separate headings
 
 
 [3]
 Compare Olympic Towing Corporation v. Nebel Towing Company, 5 Cir., 1969, 419 F.2d 230, 243, cert. denied sub nom. Nebel Towing Company, Inc. v. Olympic Towing Corporation, 397 U.S. 989, 90 S.Ct. 1120, 25 L.Ed.2d 396 (1970); Jure v. United Fruit Co., 5 Cir., 1925, 6 F.2d 6, 7; J. Griffin, The American Law of Collision Sec. 243 (1949); G. Gilmore & C. Black, The Law of Admiralty 429-430 (1957)
 
 
 [4]
 See Ryan Stevedor. Co. v. Pan-Atlantic Steam. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956)
 
 
 [5]
 2 C.Z.C. Sec. 297 provides provides in pertinent part that
 "Notwithstanding any other law, a claim may not be considered under this subchapter, or an action for damages lie thereon, unless, prior to the departure from Canal Zone waters of the vessel involved:
 
 
 [1]
 ) the investigation by the competent authorities of the accident or injury giving rise to the claim has been completed; and
 
 
 [2]
 ) the basis for the claim has been laid before the Panama Canal Company."
 Claims under the subchapter are specified by 2 C.Z.C. Sec. 292, which reads as follows:
 "The Panama Canal Company shall promptly adjust and pay damages for injuries to vessels, or to the cargo, crew, or passengers of vessels which may arise by reason of their presence in the waters of the Canal Zone, other than the locks, when the injury was proximately caused by negligence or fault on the part of an officer or employee of the Company acting within the scope of his employment and in the line of his duties in connection with the operation of the canal. If the negligence or fault of the vessel, master, crew, or passengers proximately contributed to the injury, the award of damages shall be diminished in proportion to the negligence or fault attributable to the vessel, master, crew, or passengers. In the case of a vessel which is required by or pursuant to regulations prescribed pursuant to section 1331 of this title to have a Panama Canal pilot on duty aboard, damages may not be adjusted and paid for injuries to the vessel, or its cargo, crew, or passengers, incurred while the vessel was under way and in motion, unless at the time the injuries were incurred the navigation or movement of the vessel was under the control of a Panama Canal pilot."
 
 
 [6]
 The administration of the F.E.C.A. for employees of the Canal Zone Government and the Panama Canal Company was transferred by the President of the United States to the Government of the Canal Zone by Executive Order 2455, September 15, 1916. The Governor has delegated administration of the Act to the Panama Canal Company, and 2 C. Z.C. Sec. 69 provides that the Panama Canal Company shall reimburse the Employees Compensation Fund for the benefit payments made to the Company's employees
 
 
 [7]
 Prior to July 1966, Section 8132, formerly 5 U.S.C. Sec. 777, provided for full refund to the Government after costs and reasonable attorney's fees had been deducted. Where the net judgment was no greater than the Government's compensation claim, the employee received nothing from the judgment. However, where the gross recovery was less than the Government's claim, the complainant's counsel would not go unrewarded for his efforts in obtaining the judgment. In July 1966, the Act was amended to create a guaranteed minimum share for the employee. Senate Report No. 1285, 89th Cong., to accompany H.R. 10721, 1966 Code Cong. and Adm.News, pp. 2430, 2432. Section 8132 was amended to create a greater incentive to the beneficiary to initiate his own proceedings against third party tortfeasors. See Chouest v. A & P Boat Rentals, 5 Cir., 1972, [No. 71-1696, April 10, slip opinion at 20, n. 14]
 
 
 [8]
 The guaranteed minimum share payable to Sandoval under Section 8132 consists of two elements:
 
 
 [1]
 ) One fifth of the net amount (gross judgment less costs and a reasonable attorney's fee);
 
 
 [2]
 ) "an amount equivalent to a reasonable attorney's fee proportionate to the refund of the United States."
 
 
 [9]
 Local Rule 603.4(e) (2) provides:
 "The following is the schedule of reasonable fees referred to above: either,
 Schedule A
 (i) 50 per cent on the first $1,000 of the sum recovered,
 (ii) 40 per cent on the next $2,000 of the sum recovered,
 (iii) 35 per cent on the next $22,000 of the sum recovered,
 (iv) 25 per cent on any amount over $25,000 of the sum recovered; or,
 Schedule B
 (i) A percentage not exceeding 33 1/3 per cent of the sum recovered, if the initial contractual arrangement between the client and the attorney so provides, in which event the procedure hereinafter provided for making application for additional compensation because of extraordinary circumstances shall not apply."
 
 
 [10]
 Thus, if the net judgment is sufficient to pay the full value of the Canal Company's compensation claim without infringing on Sandoval's guaranteed minimum share, then the Company's claim shall be paid in full, without diminution on account of costs or attorney's fees. However, if the net judgment is not sufficient to pay the Canal Company's claim without infringing on Sandoval's guaranteed minimum share, then the Company's share shall be decreased so as to allow Sandoval to recover his guaranteed minimum share
 
 
 [11]
 The Canal Company has suggested certain formulas upon which the appropriate calculations could be made, which the District Court may consider on remand of this cause for final accounting