785 F.2d 877
 1987 A.M.C. 2268
 EDWARD LEASING CORPORATION, a Delaware Corporation,
Plaintiff-Appellant,
v.
UHLIG & ASSOCIATES, INC., etc., et al., Defendants-Appellees.
EDWARD LEASING CORPORATION, a Delaware Corporation,
Plaintiff-Appellee, Cross-Appellant,
v.
UHLIG & ASSOCIATES, INC., a Florida Corporation,
Defendant-Appellant, Cross-Appellee,
Universal Technology Services, Inc., et al., Defendants.
 Nos. 84-5346, 84-5867.
 United States Court of Appeals,
Eleventh Circuit.
 March 4, 1986.
 
 1
 James A. Dixon, Jr., Dixon, Dixon, Hurst & Nicklaus, Miami, Fla., for Uhlig & Associates, Inc.
 
 
 2
 Eric J. Goldring, Goldring & Goldring, Maplewood, N.J., for Edward Leasing Corp.
 
 
 3
 Appeals from the United States District Court for the Southern District of Florida.
 
 
 4
 Before VANCE and HATCHETT, Circuit Judges, and ATKINS*, Senior District Judge.
 
 ATKINS, Senior District Judge:
 
 5
 Edward Leasing Corporation ("Edward Leasing"), owner of the Motor Yacht Janette ("M/Y Janette"), filed suit in Admiralty, under Rule 9(h), Fed.R.Civ.P., and pursuant to 28 U.S.C. Section 1333, against Uhlig & Associates, Inc. ("Uhlig & Assoc."), Universal Technology Services, Inc. ("UTEC"), and Ulf Uhlig ("Uhlig"), alleging breach of maritime contract to repair two main engines of the M/Y Janette. Edward Leasing also alleged an alter ego relationship among the defendants. Uhlig & Assoc., in its Answer, asserted a counterclaim for unpaid repair bills. At the close of Edward Leasing's case in chief, the district court granted Uhlig's and UTEC's Motion for Involuntary Dismissal. Final Judgment (as corrected) was entered in favor of Edward Leasing and against Uhlig & Assoc. in the amount of $200,047.52, because the court reduced the damage award by 40 percent based on Edward Leasing's own negligence. Uhlig & Assoc. filed a notice of appeal from that judgment against it, and Edward Leasing filed a cross-appeal from the final judgment in favor of Uhlig and UTEC and from that part of its final judgment as to the amount the damages were reduced.
 
 
 6
 Edward Leasing argues that the trial court (a) abused its discretion in not enforcing certain discovery orders or delaying the trial until discovery could be completed; (b) was clearly erroneous in finding there was no evidence of an alter ego relationship among Uhlig & Assoc., Uhlig and UTEC; (c) was clearly erroneous in finding that no evidence of a contractual relationship or misconduct existed regarding UTEC and/or Uhlig; and (d) was clearly erroneous in reducing the damages by 40% because of Edward Leasing's alleged negligence.
 
 
 7
 We find that (a) the district court did not abuse its discretion in its rulings upon the discovery motions and the motions for continuance; and (b) the district court was not clearly erroneous in any of its findings. We affirm.
 
 STANDARD OF REVIEW
 
 8
 The parties are in agreement that the standard of review is whether the district court abused its discretion in ruling upon the discovery motions and motions for continuance. Bell v. Swift & Co., 283 F.2d 407 (5th Cir.1960). Similarly, Under Rule 52(a), Fed.R.Civ.P., the district court's Findings of Fact will "not be set aside unless clearly erroneous."
 
 THE FACTUAL SETTING
 
 9
 The parties agree that the relevant facts are not in dispute. During October 1982 the M/Y Janette, (a 118-foot aluminum-hulled yacht of United States registry), while traveling from New Jersey to South Florida, encountered a violent storm off the coast of Cape Hattaras, which resulted in damage to her MTU 493TY V12 diesel marine engines. After weathering 50-foot seas, she eventually arrived at the New River Marina in Fort Lauderdale, Florida. The M/Y Janette 's chief engineer, who knew Uhlig previously, then contacted Uhlig & Assoc. regarding the repairs necessary on the two engines.
 
 
 10
 Uhlig represented to Edward Leasing that it had large facilities and the ability, knowledge, and experience to rebuild the MTU engines. Uhlig further stated he had experience and background with MTU engines. Uhlig also represented that he, along with his two companies (Uhlig & Assoc. and UTEC), could adequately complete the job. Uhlig then conducted a preliminary investigation of the engines and determined they should be completely rebuilt. On January 3, 1983, Edward Leasing, through its president, Edward A. Cantor, entered into a written contract with Uhlig & Assoc., through its president, Uhlig, for the removal, disassembly, correction, or replacement of all defective parts, reassembly, testing, and reinstallation of the engines. This work was to be performed at a fixed price. The agreement required that the engines, as well as any other work performed by Uhlig & Associates, be approved by Lloyd's Register of Shipping.
 
 
 11
 The engines were removed from the M/Y Janette and brought to UTEC because Uhlig & Assoc. did not have any facilities to make the engine repairs. As the repairs at UTEC's facilities were being finished, the M/Y Janette 's engines were reassembled and tested in a "test cell" up to 600 rpm (or idle speed). After this testing, the engines were reinstalled in the M/Y Janette in June 1983.
 
 
 12
 During the rebuilding of the M/Y Janette 's engines, UTEC directly billed Edward Leasing for work it performed on the M/Y Janette 's port and starboard engines, including its turbochargers and the rebuilding and cleaning of the engine valves, cylinder heads, and fuel injectors. UTEC also billed other work performed on the engines.
 
 
 13
 On August 15, 1983, after some preliminary work was completed on the M/Y Janette's hull, she was lowered into the water for dock trials. During these trials, both the port and starboard engines were tested; however, the port engine failed and the crankshaft cracked. The port engine was later removed from the M/Y Janette and returned to UTEC's facilities where it was partially disassembled. After some work on the engines, the vessel, under her own power, moved to the duPont Plaza Hotel docks. On August 16, 1983, additional dock trials of both the starboard and port engines were conducted. During these trials, Uhlig & Assoc. asserts the port engine oil pressure fluctuated between 5-13 kg/cm., even though the test notations only reflect fluctuation from 5-7 kg/cm.
 
 
 14
 Despite the warnings of Uhlig & Assoc., against the contemplated voyage to New York, Edward Leasing ordered the M/Y Janette out for a sea trial. The captain of the vessel acknowledged that any risk involved in that voyage would be the risk of Edward Leasing and not that of Uhlig & Assoc. If the trial proved successful the M/Y Janette was to continue up to New York using only the starboard engine. While attempting to navigate out of the channel from the duPont Plaza Hotel docks to the Atlantic Ocean, the M/Y Janette lost propulsion from the starboard engine, because the starboard propellor had fallen off.[1] The only means of propulsion of the yacht at this point was through use of the port engine. While in Government Cut (a portion of the channel) the Scandinavian Sun, a cruise ship, radioed the M/Y Janette stating it was overtaking her from astern. The captain of the M/Y Janette accelerated the port engine to aid in maneuvering the vessel. During the maneuver a large quantity of acrid smoke was seen to be coming from the crankcase of the port engine of the M/Y Janette. After the cruise ship passed the M/Y Janette, the port engine speed was reduced to idle and the vessel was maneuvered into deep water.
 
 
 15
 It was determined by a diver that the starboard propellor had fallen off. This information was relayed to Uhlig & Assoc. who advised that the port engine should not be used under any circumstances and that tugs should be sent to the M/Y Janette where she lay in the Atlantic Ocean. Despite this warning, the port engine was restarted and the vessel cruised, and returned at low speed to the harbor where the M/Y Janette was towed back to Jones Boat Yard. During this portion of the voyage, more smoke was observed to be coming from the crankcase of the port engine.
 
 
 16
 Upon the arrival of the vessel at Jones Boat Yard, Uhlig & Assoc. began to disassemble the port engine to determine the cause of its malfunction. Uhlig & Assoc. then notified Edward Leasing that it would rebuild the engine, with no labor charges, but it would charge Edward Leasing for all necessary parts. Uhlig & Assoc. also attempted to complete the other work on the M/Y Janette which had not been previously performed.
 
 
 17
 Shortly after the work was begun, Uhlig & Assoc. advised Edward Leasing that no further work would be performed until it was paid in full. A dispute arose over certain bills and Uhlig & Assoc. refused to perform any further work on the engines. As a result, this litigation was instituted, the parts bonded out, and the port engine, partially disassembled, was shipped to MTU of North America in Sugar Land, Texas for rebuilding.
 
 
 18
 MTU of North America determined that the engine block required line boring, 60% of the cylinder valves required replacement, as did three connecting rods and 100% of the connecting rod bolts. Those needed parts were in addition to two connecting rods, two bearings, and the crankshaft which were irreparably damaged. The port engine was rebuilt at MTU, installed in the M/Y Janette and sea-trialed by approximately January 17, 1984.
 
 
 19
 The metallurgical analysis of the M/Y Janette 's port crankshaft showed that it was actually cracked on three separate occasions with a substantial cooling period between each. Working backwards, the last cracking event occurred during the navigation of the vessel from the duPont Plaza through the sea trial and the vessel's return to Jones Boat Yard. The second event occurred during the dock trials at duPont Plaza, and the first occurred at Jones Boat Yard. Once the crankshaft had cracked, it required replacement regardless of the later cracks.
 
 
 20
 After its suit was filed on October 4, 1984, Edward Leasing began discovery requests promptly, serving Requests for Production and Interrogatories within two weeks following service[2] of Uhlig & Assoc., UTEC, and Uhlig's Answers. The trial court, on December 19, 1983, issued a notice setting the cause for trial on March 5, 1984. The trial was held on March 26-28, 1984.
 
 
 21
 Edward Leasing, on January 30, filed a Request for Discovery Conference. Edward Leasing filed a Motion for Continuance on February 14, 1984, urging that discovery motions were outstanding and that Milledge & Hermelee (co-counsel) was being substituted by Goldstein & Tanen and that Eric J. Goldring, Esq. (lead counsel), was preparing for the New Jersey Bar examination to be given on March 1, 1984. On March 5, 1984, it submitted a second Motion for Continuance. The trial court ruled on the motions on March 12, 1984, granting all of Edward Leasing's Motions to Compel, but denied its Requests for Sanctions and a Discovery Conference. On March 14th, the Court denied Edward Leasing's Motions for Continuance.
 
 
 22
 Edward Leasing sent accountants to review the appellees' financial documents. Stephen Dohan, a partner in the accounting firm, was told that there were no books and records of original entry such as cash receipt journals, cash disbursement journals, general ledger, accounts receivable or payable records, or the like. Edward Leasing filed, on the day of trial, another Motion to Compel and Request for Sanctions and orally requested a continuance of the trial. The trial was held without ruling on the motions. At the close of Edward Leasing's case in chief, the court granted an Involuntary Dismissal in favor of Uhlig and UTEC. After the trial, the court found in favor of Edward Leasing and against Uhlig & Assoc. for breach of contract and warranty in the amount of $200,047.52.
 
 THE PRETRIAL ORDERS
 
 23
 Orders relating to discovery and to the conduct of the trial are peculiarly within the jurisdiction of the trial court. Such orders will not be disturbed except upon a showing of abuse of discretion, and then only upon a showing that such abuse of discretion resulted in substantial harm to the parties seeking relief. Britt v. Corporacion Peruana de Vapores, 506 F.2d 927 (5th Cir.1975); Huff v. N.D. Cass Co. of Alabama, 468 F.2d 172 (5th Cir.1972); Bell v. Swift & Co., 283 F.2d 407 (5th Cir.1960). Edward Leasing has failed to demonstrate such an abuse of discretion on the part of the trial court, or any substantial prejudice.
 
 
 24
 The interrogatories and Uhlig & Assoc.'s objections (the only party to whom the interrogatories were propounded) are not part of the record on this appeal. Uhlig & Assoc. argues that the interrogatories violated Local Rule 10(I)(5) limiting the number to no more than one set of 40 interrogatories. Having objected to the interrogatories in toto, Uhlig & Assoc. was not obligated to answer them until ordered to do so. Having been addressed solely to Uhlig & Assoc., any claimed delay in answering them would not be applicable to Uhlig and UTEC. Appellees contend that certain of the requested documents were delivered on January 18, 1984, and the remainder of the records then available were produced to representatives of Edward Leasing by the commencement of the trial. Since Edward Leasing obtained a judgment against Uhlig & Assoc., no prejudice is apparent. In fact, Edward Leasing can pursue supplementary proceedings if there has been any improper transfer of assets by Uhlig & Assoc.
 
 
 25
 A joint pretrial stipulation was executed on February 29, 1984. Edward Leasing listed 35 (plus nine subparts) issues of fact, 16 issues of law, and 18 witnesses in support of its case. The docket sheet shows that nine depositions were noticed. It would appear, as appellees argue, that pretrial discovery and preparation were intense.
 
 
 26
 The dispositive issue in this litigation was the alleged defective repair of the engines. Edward Leasing's detailed sworn Complaint, filed October 4, 1984, disclosed substantial knowledge of the facts. The joint pretrial stipulation disclosed substantial preparation for the trial. Edward Leasing listed no less than 11 witnesses who would testify as experts. The district court's 16-page Finding of Fact and Conclusions of Law, supported by the record, disclose a comprehensive presentation of substantial evidence in support of the issues concerning the repairs and damages.
 
 
 27
 We find no abuse of discretion in the court's rulings, or failure to rule, on the pretrial motions, including the motions for continuance.
 
 THE ALTER EGO RELATIONSHIP
 
 28
 In its Final Judgment following the granting of the Rule 41(b) motion, the district court specifically found that there were (1) no evidence to support Edward Leasing's claims based on alter ego or conspiracy theories; (2) no contractual relationship between Uhlig and UTEC in support of the allegations of breach of contract; and (3) no conduct on the part of either of these parties that would constitute an independent tort or breach of any contractual relationship.
 
 
 29
 Edward Leasing argues that it adduced some evidence supporting the limited alter ego and "collusive conduct" allegations of the Complaint. The court found the agreement to remove, rebuild, and reinstall the two engines was between Edward Leasing and Uhlig & Assoc., as the Complaint alleged. UTEC billed Edward Leasing for some of the repair work. UTEC is jointly owned by Uhlig and Antonio Cuadrado. At best, the evidence showed that Uhlig & Assoc. was a private corporation, the stock of which was owned by Uhlig, and that he and his wife were the sole officers and directors. Personal expenses of the officers were paid by Uhlig & Assoc., following which personal adjustments, appellees contend, were made in the company's records.
 
 
 30
 We cannot say the district court was clearly erroneous in its findings when considered vis-a-vis the allegations of the Complaint and the evidence adduced.
 
 THE FINDINGS OF FACT AND CONCLUSIONS OF LAW
 
 31
 The district court found that (a) there was a valid contract between the parties for the removal, rebuilding, and reinstallation of the two main engines of the M/Y Janette; (b) Uhlig & Assoc. breached the contract by failing to complete its work within a reasonable time, and failing to perform the work and supply material and equipment in compliance with the manufacturer's specifications and in a workmanlike manner; (c) Uhlig & Assoc. was negligent in using procedures which were not specified by the manufacturer in reassembling the connecting rod about the crankshaft journal number 6; (d) Edward Leasing was contributorily and/or comparatively negligent in ordering the M/Y Janette to proceed on a voyage from Miami to New York despite Uhlig & Assoc.'s warning not to do so, which "increased and/or aggravated the damage to the engines"; (e) Edward Leasing was 40 percent negligent; (f) Uhlig & Assoc. was not entitled to the benefit of limitation of liability clauses in the contract; (g) Edward Leasing did not breach its contract and Uhlig & Assoc. was not entitled to prevail upon its counterclaim; and (h) Edward Leasing was entitled to recover damages from Uhlig & Assoc. in the total amount of $200,047.52 (after reduction for its own negligence), plus its costs and reasonable attorney's fees. These damages included repairs to the M/Y Janette, a lost charter, and loss of profits for a four-month period required further to repair the yacht, and prejudgment interest. Final Judgment in the amount of $200,047.52 was entered, as above recited, in favor of Edward Leasing and against Uhlig & Assoc.
 
 
 32
 Uhlig & Assoc. contends that an independent, efficient, intervening cause beyond its control caused Edward Leasing's damage. The burden is upon Uhlig & Assoc. to establish not only that the alleged intervening act of Edward Leasing (ordering the vessel out on the sea trial and contemplated voyage to New York) could not have been anticipated by Uhlig & Assoc., and that the problems with the engine would not have occurred but for that act. Dillingham Tug & Barge Corp. v. Collier Carbon & Chemical Corp. 707 F.2d 1086 (9th Cir.), cert. denied, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1983), Todd Shipyards Corp. v. Turbine Service, Inc., 467 F.Supp. 1257, 1288 (E.D.La.1978), affirmed in part and rev'd in part, 674 F.2d 401 (5th Cir.1982). In Tennessee Valley Sand & Gravel Co. v. M/V Delta, 598 F.2d 930 (5th Cir.1979), rehearing denied and opinion revised, 604 F.2d 13 (5th Cir.1979), the court required the party who claims a causal intervening act also to show that the conduct was unreasonable.
 
 
 33
 The district court found, as the record reflects, that the M/Y Janette was ordered "to travel to New York," using only the starboard engine, despite the warnings by Uhlig & Assoc. of the dangers and risks involved in undertaking the contemplated voyage and the need to determine the cause of the fluctuation and abnormally high oil pressure in the port engine that had been noted during the dock trial. The engines had not been subjected to a sea trial nor had their condition been approved by a surveyor for Lloyd's Register of Shipping. While attempting to navigate the channel leading from the duPont Plaza Hotel docks to the Atlantic Ocean, the M/Y Janette lost her starboard propeller, thus losing the propulsion of that engine.
 
 Continuing, the court also found:
 
 34
 1. The port engine of the M/Y Janette failed due to defective services performed and/or material and components furnished by defendant in rebuilding the M/Y Janette 's engines including the assembly of the connecting rod about the crankshaft at journal number 6.
 
 
 35
 2. The crankshaft of the port engine of the M/Y Janette failed when it cracked due to excessive heating as a result of loss of lubrication at journal number 6.
 
 
 36
 3. There were three separate heating events during which cracking could have occurred. Each of the events was separated by a period of several hours or days which allowed the engine to cool. The last heating event during which the cracking could have occurred was during the sea trial on August 17, 1983. The second heating event during which cracking could have occurred was during the dock trial held at the DuPont Plaza on August 16, 1983. The initial heating event during which cracking could have occurred was after defendant had rebuilt the engine and while it was still under the exclusive control and possession of defendant and prior to the duPont Plaza Hotel dock trials.
 
 
 37
 4. Subsequent to the failure of the port engine, it was rebuilt by MTU of North America. During its rebuilding, MTU discovered that the engine block had to be line bored, 60 percent of the cylinder valves replaced, three connecting rods replaced, and 100 percent of its tested connecting rod bolts had to be replaced. The need to replace these items was unrelated to the failure of the engine. These items were outside of the manufacturer's specified tolerances when used by Uhlig & Assoc. to rebuild the engine. Thus, to rebuild the engine according to manufacturer's specifications would have required the rebuilding done by MTU independently of the failure of the engine at journal number 6 of the crankshaft. (Finding No. 50)
 
 
 38
 On the basis of the findings, the district court concluded:
 
 
 39
 1. Defendant breached the contract by failing to complete its work within a reasonable time, and failing to perform the work and supply material and equipment in compliance with the manufacturer's specifications and in a workmanlike manner.
 
 
 40
 2. Defendant was negligent in using procedures which were not specified by the manufacturer in reassembling the connecting rod about crankshaft journal number 6 as follows:
 
 
 41
 a. Failing to use the manufacturer's specified procedure for measuring the length of the connecting rod bolts before reusing them.
 
 
 42
 b. Using the same torquing procedures on different connecting rod bolts contrary to manufacturer's specifications.
 
 
 43
 c. Failing to use the manufacturer's specified procedure in checking the bend and twist of the connecting rod before reusing.
 
 
 44
 3. Plaintiff is entitled to recover as damages (a) the costs to correct and complete the work defendant had agreed to perform; (b) lost use and/or profits during the excessive time which defendant took in attempting to complete the work and during the period of time taken to actually correct and complete the work by MTU; plaintiff is also entitled to recover prejudgment interest thereon, as well as costs and attorney's fees. Todd Shipyards Corp. v. Turbine Service, Inc., 674 F.2d 401 (5th Cir.1982).
 
 
 45
 4. Plaintiff was contributorily and/or comparatively negligent in that plaintiff was adequately warned by defendant on numerous occasions not to set out on August 17, 1983, for New York.
 
 
 46
 5. Said sailing was unreasonable inasmuch as no sea trials had been conducted on the M/Y Janette, and defendants had warned plaintiff against attempting the voyage to New York.
 
 
 47
 6. As a result of setting out for New York, plaintiff increased and/or aggravated the damage to the engines of the M/Y Janette. Tennessee Valley Sand & Gravel Co. v. M.V. Delta, 598 F.2d 930 (5th Cir.1979).
 
 
 48
 7. Accordingly, the court concludes that plaintiff was 40 percent negligent, and plaintiff's damages should be reduced by that amount.[3]
 
 THE NEGLIGENCE OF EDWARD LEASING
 
 49
 Edward Leasing argues that the 40% reduction for its negligence, as found by the trial court, should be limited to the cost of the engine repairs, i.e., cost of the crankshaft, ($20,074.50), two connecting rods ($1470.00), and two bearings ($209.00), or $8701.40.
 
 
 50
 The trial court based its determination of Edward Leasing's negligence on its "setting out for New York," after being "adequately warned by Uhlig & Assoc. on numerous occasions" not to do so. As the court found, Edward Leasing acknowledged to Uhlig & Assoc. "that any risk involved" in travelling to New York would be the risk of Edward Leasing. The action of Edward Leasing obviously increased the work to be done and extended the time for rebuilding the port engine. This caused, as the court found, loss of income. We do not find the court was clearly erroneous or abused its discretion in arriving at the 40% determination which was supported by the record. See also, McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); Sandoval v. Mitsui Sempaku K.K. Tokyo, 460 F.2d 1163 (5th Cir.1972).
 
 
 51
 We conclude that the district court was not clearly erroneous in making the above findings.
 
 THE PORT ENGINE REQUIRED REBUILDING
 
 52
 Prior to the M/Y Janette 's departure for New York, Uhlig & Assoc. argue that Cantor (1) ignored Uhlig's warning not to use the port engine; (2) ordered the captain of the M/Y Janette to proceed to New York using only the starboard engine; and (3) thereafter used the port engine when the starboard engine lost its propellor. This conduct, Uhlig & Assoc. contend, constituted an independent, efficient, intervening cause, precluding liability for its clear breach of the contract. In making this contention, Uhlig & Assoc. failed to recognize the court's findings concerning the heating events (paragraph No. 49 of Findings of Fact) and the obligation to rebuild the engine according to the manufacturer's specifications.
 
 
 53
 The unquestioned Findings also show that Uhlig & Assoc. (1) failed to rebuild the engine in compliance with the manufacturer's specifications; (2) breached its warranty; and (3) performed "below the standard ordinarily required in rebuilding engines of this type." This included, but is not limited to, the use of: the "finger test" as a substitute for a micrometer; the "screwdriver test" to test the critical clearance between connecting rod bearings; and the "flat table test" to measure the bend and twist of connecting rods instead of using the special jig specified by the manufacturer. Additionally, the trial court found that Uhlig & Assoc. failed properly to torque the connecting rod bolts because of its failure to be aware of the different type of connecting rod bolts and/or its failure to be aware of the "substantially different torquing procedures" required.
 
 
 54
 It is thus apparent that the port engine was to be rebuilt before it ever left the DuPont Plaza docks for the abortive journey to New York.
 
 UNTIMELY PERFORMANCE
 
 55
 Uhlig & Assoc. argue that the work on the engine was completed in June 1983. For Uhlig & Assoc. to contend that the work was timely completed in June when it admitted that the engine was not properly completed is misplaced. Whether it took them 225 days or 22.5 days is irrelevant. Because of its failure to identify basic repairs (i.e., need to line-bore the engine block) and its failure to identify crucial parts needing replacement (i.e., connecting rods and bolts), the court properly held that Uhlig & Assoc. would not have corrected its defective work prior to August 14, 1985.
 
 
 56
 Uhlig testified that after the brief dock trial at Jones Boat Yard, Uhlig & Assoc. wanted to remove the engine again. Assuming the best facts possible in favor of Uhlig & Assoc., it could have determined in June 1983 at the earliest that the engine should be removed again. This would leave it with only a few weeks to identify and make all necessary repairs before the scheduled charter date.
 
 
 57
 The trial court found that it took 21 weeks for MTU of North America, the repair facility of the engine manufacturer, to rebuild the port engine, correct the improper work done by defendant, and sea-trial the vessel. Uhlig & Assoc. failed to argue, no less produce any evidence, that the repair time would have been less than the maximum time period between the installation of the engines and the August charter (after deducting the time necessary to effect any repairs necessitated by Edward Leasing's alleged actions).
 
 
 58
 Therefore, even though the trial court found that Edward Leasing did not heed Uhlig & Assoc.'s warnings, it found that "[a]s a result of defendant's failing to timely complete the work which it had agreed to do, plaintiff lost a ... charter for a total sum of $137,500." (Finding of Fact No. 57).
 
 
 59
 The trial court also found that Edward Leasing would have chartered the vessel during the 21-week repair period for an additional four weeks, at $25,000 per week, or $100,000. This was based on the M/Y Janette 's previous charter history (Findings of Fact No. 59). Uhlig & Assoc. has failed to produce any evidence that these damages would have been avoided had Edward Leasing heeded its warnings.
 
 
 60
 The court stated at trial, and at Findings of Fact Nos. 20, 21, 22, 23, 24, 47, 49, 50, 51, and 57, that the defendants improperly rebuilt the M/Y Janette 's engine by using improper testing procedures and equipment, improper materials, improper installation techniques, and took an excessive amount of time to do same. At the end of the trial, the court observed:
 
 
 61
 There is no question that whatever caused this (engine failure) was caused by the defendants in this case.... I am telling you nobody touched that engine but ... his company (Uhlig & Assoc.), but whether or not he (Edward Leasing), as plaintiff, was the cause, in effect, that he took a defective part and drove it into [oblivion] is another point ... Whatever happened or did not happen ... (that) engine was not ready to go to New York ... The reason is something that the defendant did or did not do.
 
 
 62
 [T. 3, 253-254]
 
 
 63
 We hold that Edward Leasing was, independent of its own actions, damaged. This included the correcting of the improper work and the loss of actual and potential charters during the time period to effect same.
 
 
 64
 Uhlig & Assoc. raises three other issues which it says precluded recovery by Edward Leasing. These are (a) assumption of the risk of loss or damage; (b) waiver of the benefits of the breached contract or frustration of Uhlig & Assoc.'s attempts to perform the repairs under its warranty; and (c) the limitations of liability clause in the contract.
 
 ASSUMPTION OF THE RISK
 
 65
 Edward Leasing, prior to the vessel's departure for New York on August 17, acknowledged to Uhlig & Assoc. that "any risk involved" in that trip "would be the risk of" Edward Leasing and not Uhlig & Assoc. On this basis, Uhlig & Assoc. contends it is relieved of any liability for the consequence of Edward Leasing's negligence.
 
 
 66
 The assumption of the risk defense is not a bar to recovery in admiralty. The Supreme Court stated in Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 431, 59 S.Ct. 262, 266, 83 L.Ed. 265 (1939):
 
 
 67
 Any rule of assumption of risk in admiralty, whatever its scope, must be applied in conjunction with the established admiralty doctrine of comparative negligence and in harmony with it. Under that doctrine contributory negligence, however gross, is not a bar to recovery but only mitigates damages.
 
 
 68
 See, Tiller v. Atlantic Coast Line Railroad Co., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610 (1942).
 
 It is well settled in admiralty that:
 
 69
 In all cases of injury and/or damage, the rule of contributory negligence comes into play and the doctrine of the assumption of risk exists as in common law, but with noteworthy exceptions. Contributory negligence does not bar recovery in an action for damages, but has the effect of dividing damages or, in other words, of reducing the recovery. (emphasis supplied)
 
 
 70
 2 Benedict on Admiralty, Section 11; see also, Alcoa Steamship Co. v. Charles Ferran and Co., 383 F.2d 46, 54 (5th Cir.1967), cert. denied, 393 U.S. 836, 89 S.Ct. 111, 21 L.Ed.2d 107 (1968).
 
 
 71
 It is not questioned by Uhlig & Assoc. that it improperly rebuilt a substantial portion of the M/Y Janette 's port engine and that the engine was required to be rebuilt, regardless of the cracking of the crankshaft. The repairs and replacement of parts (other than those regarding the crankshaft, two connecting rods, and two bearings) were neither increased or aggravated by the alleged actions of Edward Leasing. The warning of Uhlig & Assoc. was uncontrovertedly of no consequence regarding these repairs. The same holds true for the $237,500 in lost charters.
 
 
 72
 The specific written acknowledgment, not assumption, of the risk referred to by Uhlig & Assoc. is OCF No. 1762 [P.X. 52-55]. The pertinent portion of the document states, "Departure of vessel prior to extensive tests and trials entails risks which owner has been made aware of." There is no language in that document, or any verbal agreement, that all potential liability of Uhlig & Assoc. would be waived.
 
 
 73
 To the contrary, Edward A. Cantor and Ulf Uhlig testified that Uhlig & Assoc. would be flown up to New Jersey to complete the requisite work if problems arose subsequent to the sea trials, but during the journey to the north. To that end, Uhlig & Assoc. even sent Anil Kapoor, its chief engineer, with the vessel and presented evidence (and now continues to argue) that it offered to make the repairs to the engine free of all labor costs.
 
 
 74
 The only risk which Edward Leasing could have assumed was that regarding the crankshaft, two connecting rods, and two bearings. The cost of same to Edward Leasing was $21,753.50 or 42 percent of the parts bill. The labor cost to rebuild the engine was under a fixed price contract and, therefore, would not figure into the reduction of Edward Leasing's award.
 
 
 75
 We hold that the court correctly found that a reasonable time to complete the rebuilding, which began in January 1983, was by the beginning of August 1983. Not having done so by August 17, Uhlig & Assoc. is liable for the loss of the charter. The aggravation of the damage to the port engine and the consequence thereof is appropriately treated in the consideration of the reduction of Edward Leasing's damages.
 
 WAIVER AND FRUSTRATION
 
 76
 Uhlig & Assoc. argues that Edward Leasing breached the contract because it would not allow Uhlig & Assoc. to rebuild the engine for a second time. Edward Leasing suggests two reasons why this offer was rejected. First, Uhlig & Assoc. asserts, erroneously, that it offered to repair the engine "without charge to the Plaintiff." Uhlig & Assoc. informed Edward Leasing it would not rebuild the engine as per the warranty, but that it would charge Edward Leasing for all materials, eventually counterclaiming for labor charges as well.
 
 
 77
 Second, it is undisputed that Uhlig & Assoc. did not know that there were different connecting rod bolts and/or different torquing procedures and that it consistently failed to follow manufacturers' specifications, as required, not to mention that it openly admits it could not determine why the subject engine failed. It was not unreasonable under the circumstances for Edward Leasing to seek out MTU to rebuild the engine.
 
 
 78
 The June 1983 date is the time the trial court determined the rebuilding process had been completed (i.e., the actual repair of the storm damage to the engines), without regard to the quality thereof. The court then allowed for delays beyond the control of Uhlig & Assoc. The court found, contrary to the assertions at trial by Uhlig & Assoc., that "There were no delays to extend the reasonable time period for defendant to complete its work due to nonshipment of parts or failure to make timely payments by plaintiff." (Finding of Fact No. 56.) After calculating such delay allowance, the court found that "Defendant should have completed the work by the beginning of August 1983" (Finding of Fact No. 54), and that "Uhlig & Assoc. had not completed its work as of August 17, 1983, a period of 225 days." (Finding of Fact No. 55.)
 
 
 79
 Under the Uniform Commercial Code, including the Florida version thereof, the time for performance is implied to be one of reasonableness. U.C.C. Section 1-204(2). The same standards apply to service contracts. The subject matter was designated as Priority Two. Mr. Uhlig testified that this priority requires the work be done as quickly as possible, but without overtime.
 
 
 80
 Uhlig & Assoc. argues that the contract contained a warranty clause which it was ready, willing, and able to perform at no expense to Edward Leasing. The record, however, shows that it was unwilling to do so at no expense to Edward Leasing. It tendered a bill for the labor charges associated with the removal and partial disassembly of the engine only weeks after the abortive voyage to New York.
 
 
 81
 Uhlig & Assoc. informed Edward Leasing that it would not perform any further work until it was paid in full. This included the invoices of August 26, 1983, and September 12, 1983, which represented the work it claimed to have performed to those dates, including that performed on the port engine. Edward Leasing disputed those bills and Uhlig & Assoc. therefore refused to work on the engines.
 
 
 82
 The rebuilding of the port engine by MTU of North America confirmed that the engine was improperly built by Uhlig & Assoc. the first time. (Finding No. 50.)
 
 
 83
 We hold that Edward Leasing did not waive the benefits of the warranty clause and was justified in having the port engine rebuilt by MTU to meet the manufacturer's specifications.
 
 THE LIMITATION OF LIABILITY CLAUSES
 
 84
 In Finding of Fact No. 60, the court found:
 
 
 85
 The terms of the Authorization and Order of Confirmations form drafted by defendant contained provisions of Warranty Limitations of Liability and Acceptance of Claims which are in conflict, deceptive, and ambiguous and are, therefore, void.
 
 
 86
 The trial court, at Conclusion of Law No. 13, stated that "the limitation of liability clauses are deceptive, ambiguous, and seek to totally absolve defendant of all liability, and, therefore, are unenforceable." In that regard, the court also found them to be in conflict with themselves.
 
 
 87
 The clauses in the Uhlig & Assoc. contract do not deter negligence on the part of the repairer, but affords a false sense of protection to the ship owner, and therefore are contrary to public policy as set forth in Bisso v. Inland Waterways Corporation, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955). See also, Todd Shipyards, 674 F.2d at 401.
 
 
 88
 In Bisso the court refused to uphold a clause in a towage contract which absolved the towing company from all liability for its negligent acts. The court set forth two main reasons for the creation and application of the rule against such clauses in towage contracts:
 
 
 89
 1. To discourage negligence by making wrongdoers pay damages; and
 
 
 90
 2. To prevent those in need of goods or services from being overreached by others who have the power to drive hard bargains.
 
 
 91
 349 U.S. at 91, 75 S.Ct. at 632-33.
 
 
 92
 Since that decision, several admiralty cases dealing with the limitation of liability clauses in boat repair contracts have distinguished Bisso and held that the parties to such repair contracts may validly stipulate that the repairer's liability is to be limited, but the cases have not allowed for total absolution of liability. See Todd Shipyards, 674 F.2d at 401; Alcoa Steamship, 383 F.2d at 46; M/V American Queen v. San Diego Marine Construction Corp., 708 F.2d 1483 (9th Cir.1983). The rationale behind upholding such clauses, so long as no overreaching is found, is that businessmen can bargain this in their negotiations and set their ultimate price accordingly. Jig The Third Corp. v. Puritan Marine Insurance Underwriters Corp., 519 F.2d 171 (5 Cir.1975).
 
 
 93
 In both Todd Shipyards and Alcoa Steamship, the so-called "red letter clause" limited the ships' repairers' liability to $300,000. Thus, the clauses were upheld, since the "potential liability for $300,000 should deter negligence." Alcoa Steamship, 383 F.2d at 55.
 
 
 94
 In M/V American Queen, the limitation clause was not an absolute exculpatory clause either, but rather absolved the repairer of liability if notice was not given within 60 days; it allowed for liability up to $100,000, as well. The court was not dealing with a total limitation of liability. Id., 708 F.2d at 1487.
 
 
 95
 Courts will not enforce such "red letter clauses" unless the contractual language at issue is clear and unequivocable and clearly indicates the intentions of the parties. Jig The Third Corp., 519 F.2d at 171; Jurisich v. United Gas Pipeline, 349 F.Supp. 1227 (E.D.La.1972). The traditional rule of construction in admiralty cases is to "construe the contract language most strongly against the drafter" and that an ambiguous clause in a maritime contract is to be interpreter under maritime, not state, law. Navieros Oceanikos, S.A. v. S.T. Mobil Trader, 1977 A.M.C. 739, 745 (2nd Cir.1977), citing Capozziello v. Brasileiro, 443 F.2d 1155, 1157 (2nd Cir.1971); American Export Isbrandtsen Lines, Inc. v. United States, 390 F.Supp. 63, 66 (S.D.N.Y.1975); and United States v. Seckinger, 397 U.S. 203, 210-211, 90 S.Ct. 880, 884-885, 25 L.Ed.2d 224 (1970).
 
 
 96
 The Uhlig & Assoc. clauses themselves are confusing. To illustrate, the following excerpted provisions are instructive:
 
 
 97
 Section 20, Paragraph 1 --The company warrants (that) ... the services performed and the equipment, materials, and components furnished are free from defects in material or workmanship ...
 
 
 98
 Section 20, Paragraph 2 --This warranty shall apply only to defects appearing within fifteen days from the date of completion of work by the company ... and upon expiration of the warranty period, all such liability shall terminate.
 
 
 99
 Section 21, Paragraph 1 --The company's liability on any claim of any kind ... shall in no case exceed the portion of the contract price allocable to the equipment or unit thereof which gives rise to the claim.
 
 
 100
 Section 21, Paragraph 1 --For products, materials, and services sold by the company but not made by the company, the company is not responsible or liable whatsoever.
 
 
 101
 Section 21, Paragraph 2 --In no event, whether as a result of breach of contract or warranty, or alleged negligence, shall the company be liable for ... cost of substitute equipment, facilities, (or) services. [R.E. 15.]
 
 
 102
 It is impossible to determine from the above provisions if Uhlig & Assoc. is liable for any defective equipment or unit (it does not manufacture engine equipment or the units therein); or improper work of its subcontractors (as services sold by, but not made by, Uhlig & Assoc.); or if defective parts are replaced or delivered to the ship to be installed at an additional cost (i.e., the cost may not be "allocable to the equipment or unit").
 
 
 103
 When the foregoing is coupled with the absolute disclaimer of liability, unless the defect appears within 15 days of completion of the work, we find that the trial court was correct. The limitation of liability clauses are unconscionable and do nothing to discourage negligence, or breach of contract, by Uhlig & Assoc.
 
 
 104
 We find the district court was correct in its holding.
 
 THE JUDGMENT ON THE COUNTERCLAIM
 
 105
 After Edward Leasing entered into the contract for the repair of the M/Y Janette 's engines, it contracted with Uhlig & Assoc. to perform additional work. This work was to be done on a time and materials basis with no fixed time for completion. It included work on the bilge system, wiring system, electrical generation system, the electronics systems, and various other items. (Findings of Fact Nos. 13 & 14).
 
 
 106
 Uhlig & Assoc. urge that this additional work could not be completed because "Edward Leasing unilaterally terminated the contracts and turned the completion of the work to another contractor." Uhlig & Assoc. also contends that it performed all the work for which the invoices were submitted. The quality of that work was seriously challenged by Edward Leasing. That record supports the court's conclusion that this work was not completed "within a reasonable time" and failed "to perform the work and supply materials and equipment with the manufacturer's specifications and in a workmanlike manner." (Conclusion of Law No. 6).
 
 
 107
 We do not find the trial court was clearly erroneous in dismissing the counterclaim.
 
 
 108
 AFFIRMED.
 
 
 
 *
 Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation
 
 
 [1]
 The loss of the propeller was not attributable to work done by Uhlig & Assoc. or Edward Leasing, but Jones Boat Yard, Inc
 
 
 [2]
 Uhlig & Assoc. objected to the interrogatories on the ground that they violated Local Rule 10(I)(5), and also filed specific objections. These objections and those to Request for Production of Documents were overruled. Answers and production followed
 
 
 [3]
 While this percentage is treated as a conclusion of law, it constitutes a finding of fact also. A special verdict of a jury under Civil Rule 49(a) finding a percentage of negligence would be treated as a "finding of fact." The trial court included a recital that any "conclusion of law which may constitute findings of fact are hereby adopted as findings of fact." (Conclusion of Law No. 18)